[Civil No. 2191.  Filed February 17, 1925.]

[233 Pac. 887.]

WILLIAM E. DEATSCH and HENRY L. DEATSCH, Copartners Doing Business Under the Firm Name and Style of DEATSCH BROTHERS, Appellants, v. CHARLES W. FAIRFIELD and MARYLAND CASUALTY COMPANY, a Corporation, Appellees.

1. TRIAL — FINDINGS OF FACT AND CONCLUSIONS OF LAW MADE BY JUDGE AT HIS HOME HELD NOT FINDINGS AND CONCLUSIONS OF COURT.—Presiding judge is not court, nor is a court a judge, and, under Civil Code of 1913, paragraph 528, findings of fact and conclusions of law made by judge at his home instead of in open court are not findings and conclusions of court.

2. TRIAL—REQUEST FOR FINDINGS AND CONCLUSIONS HELD MADE TOO LATE.—Under Civil Code of 1913, paragraph 528, request for findings of fact and conclusions of law by trial court, made immediately after rendition of judgment, held too late to be basis of error for noncompliance of trial judge therewith.

3. OFFICERS — ALL PERSONS INJURED BY ALLEGED MALFEASANCE OF OFFICER ARE NECESSARY PARTIES TO ACTION ON OFFICIAL BOND, ONLY IF RIGHTS UNDER BOND ARE JOINT ONLY. — All persons injured by alleged malfeasance of officer are necessary parties to action on his bond only if rights accruing on breach of bond are joint, and neither several nor joint and several.

---

1.  "Court" as meaning judge, see note in Ann. Cas. 1913E, 388.

4. BANKS AND BANKING — ALL INJURED DEPOSITORS OF BANK NOT NECESSARY PARTIES TO ACTION ON STATE BANK COMPTROLLER'S OFFICIAL BOND.—Under Civil Code of 1913, paragraphs 193, 199, 200, relating to conditions of official bonds and suits thereon, all depositors of bank injured by alleged malfeasance of state bank comptroller, in failing to take control of bank, *held* not necessary parties to suit on comptroller's official bond, bond being joint and several.

5. ASSIGNMENTS—TEST WHETHER CHOSE IN ACTION IS ASSIGNABLE IS WHETHER IT WILL SURVIVE AND PASS TO PERSONAL REPRESENTATIVES. — Under Civil Code of 1913, paragraphs 400, 401, test whether a chose in action is assignable is whether it will survive and pass to personal representatives.

6. ASSIGNMENTS—CLAIMS AGAINST STATE BANK COMPTROLLER ON OFFICIAL BOND HELD ASSIGNABLE.—Claims of bank depositors against state bank comptroller, based on breach of his official bond, consisting in failure to close bank when it should have been done, *held* assignable.

7. TRIAL—ORAL STATEMENTS OF CONCLUSIONS AND REASONS FOR JUDGMENT MADE BY TRIAL COURT, HELD NOT FINDINGS AND CONCLUSIONS WITHIN STATUTE.—Oral statements by trial judge of some of his conclusions from evidence, and of reasons for judgment made at time of announcing decision, *held* not entitled to consideration as findings and conclusions provided for by Civil Code of 1913, paragraph 528.

8. BANKS AND BANKING—STATE BANK COMPTROLLER HELD NOT LIABLE FOR BREACH OF DUTY IN ALLOWING BANK TO REOPEN AFTER TEMPORARY CLOSING.—Under Civil Code of 1913, paragraphs 183, 193, 194, 199, 200, and title 4 (pars. 284–305), state bank comptroller, in passing on question whether bank is insolvent, exercises judgment and discretion, and it is not until he has determined that bank is insolvent that he acts ministerially, and becomes liable on his bond for his dereliction of duty, and hence bank comptroller, who, after temporary closing of bank, in reliance on recommendations made him by depositors and his representative who had investigated bank's condition, and, on replacement of bank's working surplus, permitted it to reopen, was not liable for breach of duty, though affairs of institution grew continually worse.

9. BANKS AND BANKING—STATE BANKING OFFICERS IN GOOD FAITH DETERMINING BANK NOT INSOLVENT, AND PERMITTING IT TO CONTINUE BUSINESS, NOT LIABLE, THOUGH IT LATER PROVES TO HAVE BEEN INSOLVENT.—State banking officers, who honestly and in good faith examine bank's assets and conclude that it is not insolvent,

4.   See 20 R. C. L. 673.   6.   See 2 R. C. L. 610.   9.   See 22 R. C. L. 485.

and permit it to continue business, are not liable on their official bonds, though it later develops that institution was in fact insolvent.

See (1) 33 **C. J.,** p. 961.   (2) 38 **Cyc.,** p. 1959.   (3) 9 **C. J.,** p. 88; 29 **Cyc.,** p. 1464 (1926 Anno.).   (4) 7 **C. J.,** p. 482.   (5) 5 **C. J.,** p. 884.   (6) 5 **C. J.,** p. 885.   (7) 38 **Cyc.,** p. 1960.   (8) 7 **C. J.,** p. 482.   (9) 7 **C. J.,** p. 482.

APPEAL from a judgment of the Superior Court of the County of Maricopa. R. C. Stanford, Judge. Affirmed.

Messrs. Armstrong, Lewis & Kramer, and Mr. James R. Moore, for Appellants.

Messrs. Chalmers, Stahl, Fennemore & Longan and Mr. Luther P. Spalding, for Appellees.

ROSS, J.—The plaintiffs as depositors, and as assignees of thirty-eight other depositors, of the Exchange Bank of Peoria, a domestic banking corporation, brought this action against Charles W. Fairfield, as bank comptroller, and Maryland Casualty Company, a corporation, as surety, alleging that the sums sued for ($16,429.88) were deposited from time to time after March 22, 1921, and before February 22, 1922, by plaintiffs and their assignors; that during said times the bank was insolvent and unsafe and known to be so by defendant comptroller, or by the exercise of reasonable care and diligence on his part could have been known by him; that plaintiffs and their assignors did not know of the bank's insolvency, or that it was in an unsafe condition; that when it appeared to the comptroller that said bank was unsafe and insolvent, his duties required him to take exclusive control of the business of said bank, its property and effects, in order to prevent waste or diversion of assets, and to suspend the business

of the same until otherwise ordered by the court; but that said comptroller, in reckless disregard and violation of such duties and in bad faith, wrongfully, willfully and maliciously failed, neglected and refused to take possession and control of bank, and to do the other things so required of him. It is also charged in complaint that the comptroller willfully, wrongfully and maliciously failed and neglected to examine into the condition of the Exchange Bank at any time between December 31, 1920, and the twenty-seventh day of February, 1922; that on said last-named date the comptroller did take possession of the bank on account of its being insolvent and unsafe, and notified the Governor and Attorney General in writing; and that on March 14, 1922, the Attorney General began legal proceedings to liqui-date said insolvent bank and its business; that the assets of said bank cannot pay to exceed one per cent to its depositors.

To this complaint the defendants filed an answer setting up, first, a plea in abatement, the grounds therefor being that beside the plaintiffs and their assignors there were 136 other depositors of the Exchange Bank who were jointly and undividedly interested in any recovery upon fidelity bond sued on herein, and that they were proper and necessary parties to the action. They demurred generally to the complaint, and specifically that the plaintiffs were not entitled to sue upon the assigned claims, for the reason that they, as assignors, were not injured or aggrieved by the alleged breach of the conditions of the bond. In other words, that the claims of the assignors were nonassignable. The defendants further answering the complaint, by way of plea in bar, state that prior to March 22, 1921, the plaintiffs were depositors in the Exchange Bank, and both prior and subsequent to that date had moneys on

deposit in said bank as general depositors; that on said date the Exchange Bank suspended its business on account of large and unusual withdrawals depleting its ready and available cash, and notified defendant comptroller of their action in suspending business, and requested him to take possession of the bank and its property and assets; that on or about the twenty-eighth day of March, the plaintiffs and divers other depositors of the bank, constituting more than eighty per cent of all the deposits of said bank, represented to the comptroller that they had confidence in the officers and directors of the bank, and were desirous of having the bank reopen and continue its banking business, and presented said comptroller with the following agreement:

"State of Arizona, County of Maricopa—ss.

"Whereas, by reason of unfavorable financial conditions the Exchange Bank of Peoria has suspended business; and

"Whereas, said bank will reopen for, and continue in business, if the undersigned depositors will leave their present deposits with the said bank for a period of one year from this date, and will carry out this agreement:

"Now, therefore, the undersigned depositors of said bank having confidence with (in) its officers and directors, and being desirous of having said bank reopen and continue its banking business, each for a valuable consideration and in consideration of the signature of others hereto, does hereby agree to accept from said bank, and said bank agrees to issue to the undersigned depositors, five certificates of deposit, payable respectively in 12, 13, 14, 15 and 16 months from April 1, 1921, for one-fifth of the amount of money now to the credit of each of said depositors in said bank, in lieu of the money now due such depositors from said bank, and said Exchange Bank of Peoria agrees to redeem said certificates at their face value at their maturity.

"Dated March 28, 1921. ·

"This agreement not to be binding on any of the undersigned unless depositors representing at least eighty per cent (80%) of all deposits of the Exchange Bank of Peoria sign this agreement."

It is alleged that the comptroller relied upon the representations, covenants and agreements contained in the above writing, and permitted said bank to reopen on the twentieth day of April, 1921, and to continue to operate and do business; that by reason of the premises the plaintiffs were estopped to complain of the alleged injuries mentioned in their complaint. The answer also contains general and specific denials.

The plaintiffs filed a reply to the plea in bar which was, in substance, that the defendant comptroller had handed them the writing for the signature of themselves and other depositors, asking that the bank be reopened, and had induced them and other depositors to sign said request stating that the bank was solvent and ·safe, save only its cash reserve was below what was required by law; and if the bank were reopened they would realize their deposits, but if it were not reopened they would not realize in excess of ten per cent of their deposits; and that it was upon such representations that they signed such instrument.

The defendants' plea in abatement was held to be bad, and their special demurrers were overruled.

The case was tried before the Honorable R. C. STANFORD, sitting without a ·jury, who, on December 23, 1922, rendered judgment for defendants. Immediately after the rendition of judgment, the plaintiffs requested that the court make written findings of fact and conclusions of law. Later, on December 29th, both parties submitted to the court drafts of findings, and were heard thereon by the court in

chambers. The judge, at his home, on the night of December 30th, being the last judicial day of his term of office, made findings of fact and conclusions and deposited them with the clerk of the court on January 2, 1923, and the clerk filed them as of December 30, 1922. Plaintiffs thereafter made their motion to correct record to make it show the actual time of filing findings and then to strike them, on the ground that they were not made by Judge STANFORD during his term of office, and were not made in open court. These motions came on to be heard before the Honorable FRED C. STRUCKMEYER, Judge of the superior court of Maricopa county, and were by him granted. Plaintiffs' motion for a new trial was likewise heard by Judge STRUCKMEYER and denied, the court taking the view that the general findings of his predecessor in favor of defendants were sufficient to sustain the judgment. The plaintiffs now contend they were entitled to have special findings of fact and conclusions of law made by the court that tried the case, and the defendants by cross-assignment take the position that the findings stricken on plaintiffs' motion were found by such court, and therefore should not have been stricken. Much of the briefs and of the record is devoted to these and other questions of practice and procedure.

The plaintiffs appeal from the judgment of December 23, 1922, and from an order of the court made February 26, 1923, denying their motion to supplement the clerk's minute entry of the decision and judgment as orally announced, with certain oral statements of fact made by the court at the time.

We are satisfied the court's action in striking the findings was correct, and while the law entitles a party to findings and conclusions when the request therefor is timely made, it is not error to refuse

to make them if the request comes after judgment is rendered. The paragraph of the statute bearing on these questions is as follows:

"In every case tried before a judge of the superior court without a jury the decision of the court shall be given within sixty days from the submission of the case. The court may in any case, and shall, at the request of either party, make written findings of fact, stating the facts found by the court and the conclusions of law separately." Paragraph 528, Civ. Code 1913.

The statute imposes the duty of making these findings upon the court and not upon the judge of the court. In this respect it differs from the statutes generally, and especially from that of Texas after which it is supposed to have been fashioned. Article 1989, Vernon's Sayles' Texas Civil Statutes 1914. There is a difference between the court and the judge of the court. It takes more than the presiding officer to constitute the court. As is said in *Chow Loy* v. *United States,* 112 Fed. 354, 50 C. C. A. 279: "A court is not a judge, nor a judge a court." When we speak of a court we think of the presiding judge, a clerk, parties and attorneys, and while all of these are not necessary to constitute the court neither is the judge alone the court. *Hartshorn* v. *Illinois Valley Ry. Co.,* 216 Ill. 392, 75 N. E. 122. In *Andrade* v. *Andrade,* 14 Ariz. 379, 128 Pac. 813, we said: "Only the court can make findings" of fact. It is only by construing the word "court" to mean "judge" that there would be any plausibility in sustaining the action of Judge STANFORD in making his findings at his home instead of in open court; and when the distinction between the two words is so pronounced and well understood, we do not feel at liberty to adopt that construction.

As before stated, the request for special findings and conclusions of law was not made by plaintiffs

until after the judgment was rendered. Our statute, paragraph 528, *supra,* is silent as to when this request should be made. The Texas statute, from which it is thought ours was framed, is also silent as to when the judge shall make his findings, but article 2075 of Vernon's Sayles' Civil Statutes provides that the judge may have ten days after adjournment of the term at which a cause is tried in which to prepare his findings of fact and conclusions of law, and this has been construed as permitting the request for findings after the rendition of judgment. *Wandry* v. *Williams,* 103 Tex. 91, 124 S. W. 85. We have no such provision in this state. Those states with statutes like ours, or in which no time is fixed for making request for findings, have construed their statutes as requiring that the request be made before judgment. In *Hartlep* v. *Cole,* 120 Ind. 247, 22 N. E. 130, under a statute silent as to time of request, the court held that the request was too late when not made at the commencement of the trial. Apparently, the main reason given for so holding was that notes of the evidence, if kept at all, had to be kept by the trial judge. That is not true here, since we have stenographic reports of all the evidence in the trial of cases, and that was not true in Indiana when in *Stumph* v. *Miller,* 142 Ind. 442, 41 N. E. 812, the court said:

"While, therefore, by the aid of the stenographer's notes or otherwise, the court may make a special finding of the facts, when requested at any time before the entry of judgment. (*Thompson* v. *Insurance Co.,* 139 Ind. 325, 38 N. E. 796), yet the reasoning in the case of *Hartlep* v. *Cole, supra,* makes it clear that it must remain discretionary with the court whether such finding shall be made in case the request does not come before the introduction of the evidence."

In *Wilcox* v. *Byington,* 36 Kan. 212, 12 Pac. 826, the court said:

"It is the general rule of practice for the parties to request the court, either just before or at the close of the argument made in the case, to state its findings in writing. Clearly, the request should be made before the final decision of the court."

The Kansas court has followed this rule in the following cases: *Allen* v. *Dodson,* 39 Kan. 220, 17 Pac. 667; *Smythe* v. *Parsons,* 37 Kan. 79, 14 Pac. 444. Other courts, upon similar statutes, have taken the same view. *Stephens* v. *Mason,* 99 Tenn. 512, 42 S. W. 143; *Austin* v. *Diffendaffer,* 96 Neb. 747, 148 N. W. 907; *German State Bank* v. *Ptachek,* 67 Okl. 176, 169 Pac. 1094; *First Nat. Bank* v. *Citizens' Bank,* 11 Wyo. 32, 100 Am. St. Rep. 925, 70 Pac. 726.

Fairness to the trial judge requires that he should be advised before he renders his decision that he is expected to make special findings of fact and conclusions of law, so that he may formulate his judgment in accordance therewith, rather than burden him with the duty of making findings of fact and conclusions of law that will support a judgment already rendered. We therefore conclude that plaintiffs' request for findings of fact came too late to be made basis of error for noncompliance therewith by the trial judge.

There are some other cross-assignments by the defendants which we will consider and dispose of before we take up the plaintiffs' case. One of such cross-assignments is based upon the court's holding the plea in abatement bad. By this defendants challenged the right of the plaintiffs to maintain the action, asserting that it was necessary to make all the depositors who had suffered loss parties to the action, and it appearing that there were 136

such who had not been made either plaintiffs or defendants the action should abate. All of the depositors are necessary parties if the right accruing on the breach of bond is a joint right, but if this right is several, or joint and several, the rule is otherwise. The statute providing for the official bond of any public officer, and its conditions, reads as follows:

"Every official bond executed by any officer pursuant to law is in force and obligatory upon the principal and sureties therein to and for the state of Arizona and to and for the use and benefit of all persons who may be injured or aggrieved by the wrongful act or default of such officer in his official capacity; and any person so injured or aggrieved may bring suit on such bond, in his own name, without an assignment thereof." Paragraph 199, Civ. Code 1913.

Paragraph 193 makes all official bonds joint and several, and paragraph 200 authorizes successive suits until the whole penalty is exhausted. It was clearly within the contemplation of these statutes to allow one or more suits on a bond, and to allow parties to sue jointly or severally, as they might choose, even though their loss or grievance may have arisen out of the same transaction or wrong. Such was the holding in *State* v. *Title Guaranty & Surety Co.*, 27 Idaho, 752, 152 Pac. 189, under identical statutes, and we believe it is the general rule. 9 C. J. 87, § 153.

Defendants also assign as error the court's action in overruling their special demurrer to the complaint. By this defendants challenged the right of plaintiffs to sue on assigned claims, claiming the right of action is nonassignable. The test of assignability of a chose in action is whether it will survive and pass to the personal representative. If it will survive it can be assigned, and under the statutes,

paragraphs 400 and 401 of the Civil Code, the assignee may sue thereon in his own name.

"It is generally held that all claims and choses in action sounding *ex contractu* are assignable, including not only rights of action for breaches of contract, but also those based on negotiable and non-negotiable instruments, and on judgments, bonds, book accounts, annuities, and similar choses in action." 3 R. C. L. 595, § 3.

We think there can be no question but that the claims of the depositors who assigned to the plaintiffs were assignable, and that the plaintiffs were entitled to sue thereon.

There is another question bearing upon the findings or lack of findings and conclusions that has received much attention in briefs, and it seems necessary to get this question out of our way before going to the assignments involving the merits of the controversy. The trial judge, in announcing his decision on December 23d, orally stated some of his conclusions from the evidence, and the reasons for holding the defendants not liable for the losses sustained by plaintiffs. While we would be glad to accept these oral statements, when of facts or conclusions of facts, as a basis for the consideration of the judgment entered by the trial court, it is obvious they are not findings and conclusions as provided for in paragraph 528, *supra*. The oral opinion of the court, and the reasons he may have given for his judgment, may be very illuminating as to the theories and principles upon which the case was tried and decided, but they are not findings of fact and conclusions of law.

"In this case it does not appear that any express finding of facts was filed prior to the filing of the one in question. It is true, the court previously filed an opinion, but, while an opinion of a court, in deciding a case, setting forth the reasons for the

judgment, may be of great importance, on account of the information which it imparts respecting the legal principles which govern the court and should guide the litigants, such opinion is not a finding of facts, within the meaning of the statute, and will not be so regarded. The decision which is required to be filed under section 3168 is an entirely different thing from an 'opinion,' which a trial court may or may not file as it pleases. The decision of a court is its judgment; the opinion consists of the reasons given for the judgment. In rendering the decision the finding of facts and conclusions of law must be separately stated, and, when so stated, they form the basis of the judgment or decision. Rev. Stats., § 3169; 5 Ency. Pl. & Pr., 2d ed., 936, 937, and note; *McClory* v. *McClory,* 38 Cal. 575."

See, also, *Upton* v. *Weisling,* 8 Ariz. 298, 71 Pac. 917.

There are several other questions of practice and procedure that are argued or mooted, but as we do not consider them essential to a decision, we shall pass them and proceed to the merits of the case.

The plaintiffs raise three points by their assignments, but all in fact are directed to the one proposition, that the judgment is contrary to the law and the evidence. The statute, paragraph 183, Civil Code of 1913, requires the elective officers of the state to execute bonds for the faithful performance of their duties, and paragraph 194 prescribes the form of such bond, in these words:

"The condition of an official bond must be that the principal will well, truly, and faithfully perform all official duties then required by law, and also such additional duties as may be imposed on him by law. Such bond must be signed by the principal and at least two sureties or a duly qualified surety company, and said bonds shall comply and be subject to all the terms and conditions of the laws of this state governing official bonds."

The bond executed by defendant officer and surety was conditioned as follows:

"That if the said Charles W. Fairfield shall well, truly and faithfully perform all official duties required of him by law, and shall well, truly and faithfully perform and execute all such additional duties of such office of State Auditor and Superintendent of Banks required by law to be enacted subsequently to the execution of this bond, then this obligation is to be void and of no effect, otherwise to remain in full force and virtue."

The banking law of the state, in force during the happening of the things alleged in complaint, is contained in title 4 of the Civil Code of 1913. By it the state auditor, by virtue of his office, is the state bank comptroller. Defendant Fairfield was elected state auditor at the general election in 1920, and took office January 5, 1921. Among his prescribed duties as comptroller were the issuing of all licenses to persons or corporations to carry on banking business; to visit at least once every year and oftener if in his judgment necessary, all banks in the state, and make full and strict examination either personally or by expert accountant, and to inspect and carefully examine all books, records, papers, notes, bonds or evidences of indebtedness, and all funds, securities and assets of such corporation and institutions, and to thoroughly examine into the affairs and financial condition of such institutions, their solvency and ability to fulfill their obligations, and report the same to the Attorney General. If a bank upon such examination is found to have violated any law of the state, or is found conducting business in an unsafe manner, the comptroller is required to notify it to cease such illegal and unsafe practices, and upon a refusal so to do, or if it appears unsafe to permit it to further transact business, it is made the duty of the comp-

troller immediately to take exclusive possession and control of its business, property, and effects in order to prevent waste or diversion of its assets; to suspend its business, if not already voluntarily or by legal process suspended, and to hold possession until otherwise ordered by the court; and to notify the Governor and Attorney General of his action. Thereupon it is made the duty of the Attorney General to institute legal proceedings for the purpose of liquidating the bank's business. If, upon a hearing, the court finds the bank solvent and safe to continue business, it shall dismiss the action and order a return of its assets, but, if the court finds it unsafe to continue business, or that it is insolvent, it shall order it into involuntary liquidation.

It is obvious from the statute that the comptroller has no power to interfere with a banking institution until he comes into possession of knowledge of its violating some law of the state, or of its unsafe condition to continue to transact business; and it is likewise clear that his duty to visit and examine such institution is not breached until one year after his induction into office, unless in his judgment it is necessary that he do so at an earlier date. The language is that he shall make such examination "at least once in each year, and as often as said comptroller may in his judgment deem necessary." The Exchange Bank of Peoria closed its doors on the night of March 22, 1921—less than three months after defendant Fairfield took office—and the officers thereof voluntarily notified the comptroller that they would not be able to open for business the next morning on account of the depleted condition of the bank's cash reserve, and the anticipated withdrawals because of the general situation.

In the first quarter of 1921 the following banks had suspended: Central Bank of Willcox on Janu-

ary 7th, Central Bank of Phoenix on March 19th, Citizens' Bank of Phoenix and the Exchange Bank of Peoria on March 22d, and the Somerton State Bank on March 28th. The legislature had provided for the salaries of only two regular bank examiners, and these were not able under the circumstances to do all the work immediately necessary to be done by the comptroller. This officer secured the services of one Kenneth Freeland, who had been recommended by local bankers, as he states, as capable and trustworthy, and charged him with the duty of examining into the Exchange Bank's financial condition and reporting the same. Mr. Freeland made such examination and stated to the comptroller that, in his opinion, the bank had been forced to close because of a depletion of its reserves due to the general condition obtaining throughout the Salt River Valley, and that, under proper and certain conditions, the bank would be able to resume business and take care of its obligations; such conditions being a restoration of the legal reserve, a voluntary assessment of forty per cent of the capital stock against the stockholders, and at least eighty per cent of the deposits agreeing not to withdraw accounts for one year and four months after resumption. Freeland represented to defendant comptroller that depositors and customers of bank were unanimous in wish to have it reopened; that he had looked into the bank's loans and the character of the makers of its paper and their attitude toward the situation, and had canvassed these matters with the president, vice-president, and cashier of the bank, and had become satisfied the bank was solvent, and so advised defendant comptroller.

The legal reserve of the bank was made up, there being paid in on that account over $20,000; the assessment against the stockholders on capital of

$25,000 was collected and paid to the sum of $7,800; and an agreement signed by more than ninety per cent of deposits to defer withdrawals, as specified, was executed. This being done, on April 20, 1921, the comptroller restored the bank to its officers, who again resumed business and served the community of Peoria until February 22, 1922, when it was again taken over by the superintendent of banks (this officer's title having been changed in the meantime) as insolvent, and reported to the Attorney General who in turn took legal steps towards its liquidation.

The trial of this case took place in December, 1922, more than twenty months after the Exchange Bank of Peoria suspended the first time, and after Freeland had examined into its condition and reported it to defendant comptroller as solvent. In the interim, after a vain and hopeless struggle against a sea of financial troubles, the institution was discovered to have been unseaworthy from the beginning, and, of course, it was realized that it never should have been sent upon a second voyage. Changing the simile, after a trial it was proven to be a disastrous business venture; one that none of the interested parties would have advised or undertaken if he could have looked into the future and foretold what it held in store for the farmers, bankers, merchants, and business men of the Salt River Valley. It was easy enough after the thing had happened to see that it was inevitable. The fact was when the bank was turned back to its officers in April its loans and discounts, owing to the general slump in everything and the tightness of the money market, had become frozen securities; but everyone was hopeful and optimistic for the future, and, as just before that date the farmers in the valley had plowed up their alfalfa farms to grow dollar cot-

ton, the good times were expected to return during the year and enable everybody to care for their obligations. When a judgment upon values of a fluctuating market is required, it is impossible to be accurate of the future, and such judgment should be viewed from that standpoint.

It is not required that the comptroller's judgment, as to whether a bank is insolvent, be infallible. His action as judged by the beliefs and standards prevalent at the time doubtless was what the ordinarily prudent and cautious person would have done under the same conditions and circumstances. This is the view taken by the trial court, and it has been our uniform practice not to disturb the verdict and decision of the trier of facts, when such verdict or decision is arrived at upon disputed evidence, or when undisputed, reasonable minds may reasonably draw therefrom different inferences or conclusions. If the known certain value of the bank's assets at the time of the trial be taken as the criterion, then it was unquestionably insolvent when it was turned back to its officers in April, 1921. But if the problematical value of such assets as seen by those concerned, the stockholders, officers, depositors and the comptroller, be adopted as the criterion, and. the universal rule of judging their action by what the ordinarily prudent person would have done in similar circumstances be the yardstick applied, a different conclusion will be reached. The duties of a bank comptroller, or commissioner, are so well and accurately set forth in two instructions given by the court in *State* v. *Title Guaranty & Surety Co.,* 27 Idaho, 752, 152 Pac. 189, and note in Ann. Cas. 1916E, 219, that we here quote them:

"Whenever a statute imposes certain duties upon an executive officer like a bank commissioner, and directs that he shall use his discretion in passing

upon certain matters, he is not liable for a mere mistake in judgment or opinion committed by him in exercising such discretion. Accordingly, if the bank commissioner in the exercise of his discretion shall merely make a mistake in passing judgment upon the question of whether or not the capital of a bank was impaired and reduced below the amount required by law, or upon the question as to whether or not the bank had unlawfully refused to pay a depositor in accordance with the terms of his deposit, or upon the question as to whether said bank had become insolvent, such bank commissioner would not be liable for such mistake in judgment, no matter what might be the consequences.

"However, if upon exercising his discretion and using his own judgment, the bank commissioner of the state becomes satisfied in his own mind that any bank or trust company has unlawfully refused to pay its depositors in accordance with the terms of their deposits, or that such bank has become insolvent, it becomes his duty to forthwith take possession of the books, records and assets of every description of such bank and hold the same, and to collect all debts, dues and claims and sell or compound all doubtful debts and to sell all real and personal property on such terms as the court of said judicial district shall direct."

The comptroller, in passing upon the question as to whether a bank is solvent or not, exercises judgment and discretion, and it is not until he has determined the bank to be insolvent that he acts ministerially and becomes liable on his bond for dereliction of duty. This seems to be the rule uniformly announced and followed. 29 Cyc. 1443 et seq.; 22 R. C. L. 485, § 163; *State* v. *American Surety Co.*, 26 Idaho, 652, Ann. Cas. 1916E, 209, 145 Pac. 1097.

The plaintiffs, however, contend that as soon as the Exchange Bank of Peoria suspended and was taken into the possession of the comptroller, the

statute made it his mandatory duty, together with the Attorney General, to proceed to its liquidation unless otherwise ordered by the court; that that is what the statute says he must do, and he cannot lawfully do anything else, and his failure to follow the statutory procedure was a breach of his bond entailing the liability herein claimed.

In *Valley Bank* v. *Malcolm*, 23 Ariz. 395, 204 Pac. 207, we held that the procedure set out in title 4, *supra*, was exclusive of every other remedy, when liquidation through the courts was decided upon, but that the comptroller and Attorney General might co-operate with the bank, its stockholders, and depositors in settling the bank's affairs out of court; the facts in that case being that a new bank corporation was organized, and the assets of the insolvent bank conveyed to it, it agreeing to pay all debts and obligations of the latter appearing of record in its books. This arrangement we held not to be in violation of a reasonable and fair construction of the statute. The contention in that case was the same as plaintiff's contention here. The court's comment thereon is worthy of repeating:

"The view contended for by appellee would absolutely prevent the reorganization or reopening of a suspended banking institution or the taking it over, except through a sale by a receiver, by another institution. The practice of reopening or reorganizing banks whose condition has been such as to require their temporary suspension is too common and too beneficial to all interested, as well as to the public generally, to be done away with by a construction of a statute, unless its terms imperatively require that conclusion. The failure of a bank and the permanent closing of its activities and the winding up of its affairs through a receiver may in many instances be a public calamity, and the avoiding of such result is not to be prevented unless the Legisla-

ture by the most unmistakable language has so enacted.''

The court in the Valley Bank case did not hold, as suggested in brief, that the comptroller and Attorney General had discretion to return an insolvent bank to its officers, and permit it to continue to transact business knowing it to be insolvent. This question was not before that court. Unquestionably officers guilty of doing such a thing would be liable on their official bonds; but officers who honestly and in good faith examine a bank's assets and arrive at the conclusion that it is not insolvent and permit it to continue to transact business, are not liable on their official bonds if it later develops that such institution was in fact insolvent.

Having come to the conclusion that the comptroller, in examining the condition of the Exchange Bank, with a view of determining whether or not it was solvent, was acting in a *quasi*-judicial capacity, and that the state of the evidence on the issue of solvency was such as to require the exercise of judgment in its determination, it becomes unnecessary to pass upon the effect of the defendants' plea in bar. By this plea it is contended by defendants that plaintiffs, and all other depositors of the bank who petitioned the comptroller to permit the bank to reopen, were estopped from claiming damages on account of the act done by comptroller at their request. Whether this is true or not probably depends upon the knowledge of such depositors of the condition of the institution at the time the request was made. One thing is certain — even though they may not have been in possession of exact knowledge of the bank's condition, they were not blind to the general conditions prevalent in the Salt River Valley and throughout the whole country, and of the frequent suspension of banks, not

only in Arizona but elsewhere. They also must have had a more personal and intimate knowledge of the man at the head of the bank than the comptroller when they vouched for the honesty and ability of its president, and asked that he be left in charge upon the resumption of business. Whatever the legal effect of this conduct, it is easily imaginable that it may have influenced the comptroller to resolve every doubt in favor of the bank's solvency, and, if so, upon plain principles of morals, if not of law, their lips should be closed.

Judge STANFORD, who tried the case and heard the testimony, resolved the issues of fact in favor of defendants, and Judge STRUCKMEYER, who passed on the motion for a new trial, while stating that he "viewed it solely in the light of the general finding necessarily comprehended in the judgment for the defendants," did look into the testimony to some extent, and interrogated himself in this manner:

"But which testimony was the more persuasive to the trial judge, he having the opportunity of judging of the witnesses' testimony as given by them upon the stand? Should the facts brought home to the defendant have suggested further inquiry, or did the defendant have the right, was he justified in relying upon the optimistic views of the many people shown by the record to have been by him consulted? Did the testimony show good faith? His conduct, of course, must be viewed in the light of the then existing conditions. Did he, in good faith, believe that 'the bottom had been reached,' and was he justified, as a reasonable, prudent person, to act upon this belief? This the trial judge had the better opportunity of judging, and it would be presumptuous on my part, being deprived of the opportunity of judging of the witnesses' testimony as given by them upon the stand, having but a partial transcript of the evidence before me, to overrule the impressions made upon the mind of the

trial judge, and hence his finding of fact resulting therefrom.''

He thereupon refused to grant the motion for a new trial.

We conclude that the judgment should be affirmed, and it is so ordered.

McALISTER, C. J., and LOCKWOOD, J., concur.