[Civil No. 2412.    Filed September 16, 1926.]

[249 Pac. 71.]

# STOCK GROWERS FINANCE CORPORATION, Appellant, v. FEN S. HILDRETH, as Receiver of THE ARIZONA CATTLE COMPANY, and THE ARIZONA CATTLE COMPANY, a Corporation, Appellees.

1. SUBROGATION—IN ABSENCE OF FRAUD OR INTENT TO HINDER CREDITORS, MORTGAGEE UNDER DEFECTIVE CHATTEL MORTGAGE TAKING UP PRIOR VALID MORTGAGE FOR SMALLER AMOUNT HELD ENTITLED TO LIEN TO EXTENT OF PRIOR MORTGAGE (CIV. CODE 1913, PAR. 4124).—Even if chattel mortgage, executed in part to take up valid mortgage for smaller amount, was defective under Civil Code of 1913, paragraph 4124, requiring affidavit of good faith, mortgagee was entitled to lien to extent of old mortgage, in absence of fraud or design to hinder or delay creditors.

2. BILLS AND NOTES—CHATTEL MORTGAGES—MORTGAGES.—Purchaser in due course of negotiable paper takes it and any mortgage securing it free from equitable defenses between parties thereto and secret or latent defects in mortgage.

3. CHATTEL MORTGAGES—FACTS HELD NOT TO SHOW THAT PURCHASER OF NOTE SECURED BY CHATTEL MORTGAGE KNEW OR SHOULD HAVE KNOWN THAT OFFICER OF MORTGAGEE DID NOT EXECUTE AFFIDAVIT OF GOOD FAITH AS RECITED THEREIN (CIV. CODE 1913, PARS. 4124, 4201).—That purchaser of note secured by chattel mortgage received letter on August 12th at Chicago, from officer of mortgage, dated St. Louis, August 11th, *held* not to show that purchaser knew or should have known that such officer was not in Tempe, Arizona, on August 12th, when affidavit of good faith required by Civil Code of 1913, paragraph 4124, was purported to have been signed by him, so as to constitute notice of infirmity under paragraph 4201.

4. CHATTEL MORTGAGES—THAT AFFIDAVIT OF GOOD FAITH WAS MADE ON DATE OTHER THAN DATE RECITED IN JURAT HELD NOT TO AFFECT ITS VALIDITY (CIV. CODE 1913, PAR. 4124).—That jurat in affidavit of good faith required by Civil Code of 1913, paragraph 4124, was made on date other than that recited therein would

---

1. See 18 Cal. Jur. 197.

2. See 18 Cal. Jur. 93, 114; 19 R. C. L. 355.

4. Sufficiency of officer's jurat to affidavit to chattel mortgage see note in 1 A. L. R. 1573. See, also, 5 R. C. L. 395.

not affect validity of affidavit, fact of making oath and not its date being essential thing.

5. CHATTEL MORTGAGE — FINANCE CORPORATION LENDING MONEY TO CATTLEMEN THROUGH LOCAL BANKS AND LOAN COMPANIES ONLY HELD INDORSEE FOR VALUE WITHOUT NOTICE.—Finance corporation lending money to cattlemen in many states through local banks and loan companies only, which were required to indorse notes for loans, *held* indorsee for value without notice of defect in mortgage and not payee or mortgagee, and local concerns were not its agents.

6. TRIAL.—Trial court's reasons for its decision in written opinion are not findings of fact within Civil Code of 1913, paragraph 528.

See (1) 11 C. J., p. 482, n. 49, 50, p. 483, n. 57; 37 Cyc., p. 472, n. 93.   (2) 8 C. J., p. 718, n. 12; 11 C. J., p. 668, n. 21, 22, p. 669, n. 31, p. 670, n. 32, 33, 34, 35; 27 Cyc., p. 1322, n. 66, 67.   (3) 11 C. J., p. 668, n. 21.   (4) 11 C. J., p. 487, n. 19.   (5) 11 C. J., p. 668, n. 22.   (6) 38 Cyc., p. 1961, n. 59.

APPEAL from a judgment of the Superior Court of the County of Maricopa. Fred C. Struckmeyer, Judge. Reversed and remanded, with directions.

Messrs. Foster & Foster, for Appellant.

Messrs. Jennings & Strouse, for Appellee receiver.

ROSS, J.—This suit is by the Stock Growers Finance Corporation, indorsee upon a negotiable promissory note of the Arizona Cattle Company, hereinafter called Cattle Company, dated August 12, 1921, for $100,000, to E. E. Overstreet Cattle Mortgage Company, hereinafter called Mortgage Company, and to foreclose a chattel mortgage of even date, given by the payor to the payee to secure said note. The mortgage was upon all cattle (given as 8,450 head) and all horses, saddle and range (130 head), and all range improvements such as fences, houses, equipment, water and possessory rights belonging to the mortgagor, ranging and situate in Yavapai

5.   See 5 R. C. L. 395.

county, Arizona, and on alfalfa farms of W. J. Kingsbury in Maricopa county, Arizona.

In July, 1921, the mortgagor Cattle Company owed to the Mortgage Company, of St. Louis, Missouri, $40,000 upon overdue paper, secured by first mortgage on said property. It also owed to Gammill Brothers, of St. Louis, $9,800 and some interest, which it wanted to take up.

It appears that before July credit had been practically withdrawn from the livestock industry, and upon the suggestion of the treasurer of the United States a pool of $49,000,000, for the purpose of furnishing financial aid to the industry, was formed by 207 banks situate in different parts of the United States. The Stock Growers Finance Corporation, hereafter designated Finance Corporation, was organized under the laws of Virginia for the purpose of conducting the business of making such loans. On July 13th, W. J. Kingsbury, writing as president of the Farmers' & Merchants' Bank, of Tempe, Arizona, addressed a letter to Mr. M. A. Taylor, stating that he had noticed from the Associated Press Dispatches that Taylor was a member of the executive committee ''appointed for managing the $50,000,000 pool to be used in financing cattlemen.'' He said in his letter he was ''writing in behalf of ourselves and two other local bankers in order to get the details connected with applications for loans.'' Also, ''I wish to put in an application for the Arizona Cattle Company for a loan of one hundred thousand dollars, or so much thereof as the committee think proper to loan on the security offered.'' On July 21st, Mr. M. L. McClure, president of the Finance Corporation, wrote Kingsbury as follows:

''We call attention to the following: No loans will be made direct, but must come through a substantial bank or loan company guaranteeing payment. Each

loan will be considered on its own merits. Securities should have a margin at least 25 per cent above advance. Prepare papers the same as though for discount at a city bank or for the Federal Reserve Bank, where the paper must be eligible. Loans offered by state banks must not exceed in size 10 per cent of paid-in capital and surplus. No amount of our funds is prorated to any state, vicinity, or bank. Abstract of chattel mortgage records should show all chattel mortgages on record against maker of loan offered.''

The limitation of loans through ''state banks to ten per cent of paid-in capital and surplus'' disqualified the Farmers' & Merchants' Bank of Tempe, and after several letters and telegrams were exchanged between Kingsbury and McClure, in which the latter insisted upon the observance of such limitation, on August 5th the Mortgage Company, which had a mortgage on the Cattle Company's property for $40,000, overdue, mailed an application to the Finance Corporation for a loan of $100,000. In this letter it was stated notes for loan would be indorsed by W. J. Kingsbury, V. C. Kingsbury, and M. West, who own practically all the stock of the Arizona Cattle Company; that a financial statement dated December 31, 1919, showed their combined net worth was $587,000, of which $150,000 was clear real estate. This letter was signed by E. E. Overstreet, president of the Mortgage Company, and in it he assured the Finance Corporation he had been over the property thoroughly several times and was ''perfectly satisfied that it is a gilt-edged deal,'' and he closed his letter in these words: ''Kindly advise at your earliest convenience if we may forward papers for discount with you.''

This application was forwarded by the Finance Corporation to an Arizona Advisory Committee, consisting of M. B. Hazeltine, M. I. Powers, and Charles E. Walker, bankers, who on August 23d wrote the

Finance Corporation that they had ''carefully considered the application of the Arizona Cattle Company for a loan of $100,000 to be secured by first mortgage on its company's cattle, range, and range rights, and to be indorsed by W. J. Kingsbury, V. C. Kingsbury and Mrs. M. West and the E. E. Overstreet Cattle & Mortgage Company of St. Louis, Missouri, and believe that the quick assets to be of such nature as to render likely the repayment when due.''

About this time W. J. Kingsbury, president of the Cattle Company, went from Arizona to St. Louis, taking with him the note for $100,000 and chattel mortgage on cattle, horses, ranges, etc., to secure note. On August 28th he left St. Louis for Chicago carrying from the Mortgage Company a letter of introduction to the Finance Corporation. In that letter it was said:

''This will introduce to you Mr. W. J. Kingsbury, president of the Arizona Cattle Company of Tempe, Arizona, for whom we have put in an application for a loan of $100,000. Mr. Kingsbury has all the necessary papers to complete the loan. If accepted we will forward our present notes and mortgage for collection.''

A follow-up letter of August 29th advised the Finance Corporation that Kingsbury had all the necessary papers on application for $100,000, which included note indorsed by the Mortgage Company, also recorded mortgages, statement, and abstracts of the county clerk. In this letter the Mortgage Company directed the Finance Corporation what to do with the proceeds of the note ''if . . . accepted by you for discount.'' The instructions were to pay the note and mortgage of $40,000 due the Mortgage Company, which had been forwarded to the First National Bank of Chicago for collection, and the $9,800 note and

interest of Gammill Brothers sent to the same bank for collection. As to the balance, they said:

"We also authorize you to pay to Mr. Kingsbury the balance of proceeds, taking receipt from him for us for the amount you pay him."

On August 29th Kingsbury, in Chicago, presented his letter of introduction to the officers of the Finance Corporation and also submitted to them the note and mortgage in question. These instruments were examined and approved by the executive committee of the Finance Corporation, and on that day the note was discounted for $96,752.80, which amount was passed to the credit of the Mortgage Company and paid out, as per such company's instructions, as follows: $50,000 to the First National Bank of Chicago, covering notes and mortgage of the Mortgage Company and note of Gammill Brothers heretofore described, and the balance of some $46,000 to W. J. Kingsbury.

The officers of the Finance Corporation knew Kingsbury to be a banker and believed in his honesty and trusted him. He assured them that "the paper is absolutely clear and free of all defects." (The Finance Corporation discounted Arizona Cattle paper during 1921, through banks or loan companies, in the sum of $700,000 or $800,000.)

The affidavit of *bona fides* of the mortgagor and mortgagee was in words and figures as follows:

"State of Arizona,
County of Maricopa—ss.:

"W. J. Kingsbury, president, acting in behalf as such officer for Arizona Cattle Company, a corporation, the mortgagor within named, and E. E. Overstreet, president, acting in behalf as such officer for E. E. Overstreet Cattle Mortgage Company, a corporation, the mortgagee within named, being first duly sworn, each for himself and not one for the

other, doth depose and say that the foregoing mortgage is *bona fide* and made without any design to defraud or delay creditors.

"W. J. KINGSBURY,

"E. E. OVERSTREET, Prest.

"Subscribed and sworn to before me this 12th day of August, 1921.

"R. A. WINDES,

"Notary Public.

"My commission expires 2–21–24.''

As a matter of fact, the oath to the above affidavit was not made by E. E. Overstreet for the mortgagee or at all.

The note was renewed from time to time, but on August 2, 1923, the Cattle Company being found to be insolvent, the defendant Hildreth was appointed, by the superior court of Maricopa county, receiver for it. He thereupon qualified as such and took possession of all the mortgaged property, and as such receiver he is made a defendant in this suit.

Other defendants are certain junior mortgagees and persons who purchased some of the cattle subsequent to the recording of the mortgage sought to be foreclosed. These latter and the receiver, Hildreth, interposed several defenses, but the trial court ruled against them on all of such defenses except one, and, as defendants are content with such ruling, they make no question of its correctness on this appeal.

The defense relied upon and sustained by the court was not against the validity of the note or the indebtedness it evidenced, but against the validity of the chattel mortgage. It was set up in the answers that the affidavit of *bona fides* was not made by the mortgagee or by anyone for or on its behalf. Although it appears on the face of the mortgage that the affidavit of *bona fides* was taken at the same time and place and before the same notary, as a matter

of fact E. E. Overstreet was not present to take the oath and did not then or later take it.

The case was tried before the court without a jury, and upon the facts we have related the court found the plaintiff Finance Corporation was not the holder of note and mortgage in due course, and entered judgment denying the right to foreclose mortgage, thus leaving such mortgaged property as a part of the general assets of the Cattle Company, free from mortgage lien and available to the general creditors. The correctness of this ruling is challenged on this appeal.

It is the contention of the plaintiff that it is the owner and holder in due course of the note and mortgage and that, the defect in the mortgage not appearing on its face, the defect being latent, it took the mortgage like it took the note.

Paragraph 4124 of the Civil Code of 1913 provides:

"No chattel mortgage shall have any legal force or effect except between the parties, unless . . . ; and the mortgagor and mortgagee shall make affidavit that the mortgage is *bona fide* and made without any design to defraud or delay creditors, which affidavit shall be attached to such mortgage."

The mortgage here, even though not verified as the statute seems to require, was not void. It was valid between the parties. Its recordation afforded to creditors and subsequent mortgagees and purchasers the same notice as it would have had it been in fact verified by the mortgagee. In this situation, if the mortgage should be regarded as a thing apart from the note it was given to secure and therefore not negotiable, it may be granted the defect, although hidden, could be urged by the receiver in behalf of the open creditors of the insolvent; but, if the mortgage is to be treated as an incident of the note, taking all its qualities of immunity in the hands of a holder

in due course, neither the creditors nor the receiver in their behalf, nor subsequent mortgagees or purchasers, can raise the question of its invalidity or defective quality.

The question is an important one in regard to commercial paper, and, if the conclusion of the trial court is right, a most disastrous one for the plaintiff. It is clear that all the equities, if that side of the question is to be considered, are with the plaintiff. Forty thousand dollars of the consideration paid by plaintiff for the note and mortgage were used in paying off to the Mortgage Company a first mortgage on the property covered by plaintiff's mortgage. The plaintiff's money, to that extent at least, being used to lift an unquestioned prior valid mortgage, should have protection upon a doctrine closely akin to that of equitable subrogation. One of the purposes of the loan was to take up this mortgage, which was done, and the mortgage here to that extent was a substitution for the old mortgage.

As was said in *Swift* v. *Kraemer,* 13 Cal. 526, 73 Am. Dec. 603:

" . . . We regard the cancellation of the old mortgages and the substitution of the new, as contemporaneous acts. It was not creating a new incumbrance, but simply changing the form of the old. A court of equity, looking to the substance of such a transaction, would not permit a release, intended to be effectual only by force of, and for the purpose of, giving effect to the last mortgage, to be set up, even if the last mortgage was inoperative."

We do not regard the equities any less entitled to protection where the substituted note and mortgage are for an amount in excess of the first, where, as in this case, there is no taint of fraud or design to hinder or delay creditors, but of course the doctrine of subrogation would not apply to such excess. *American*

*Savings Bank & Trust Co.* v. *Helgesen,* 64 Wash. 54, Ann. Cas. 1913A 390, 116 Pac. 837; Id., 67 Wash. 572, Ann. Cas. 1913A 390, 122 Pac. 26.

But, aside from the equitable considerations, and they certainly are many and cogent, we think the law of commercial paper will not permit the judgment to stand. It is settled in this jurisdiction, and in most of the other jurisdictions where the question has arisen, that a purchaser in due course of negotiable paper takes it and any mortgage given to secure its payment free from equitable defenses between the parties thereto, as well as secret or latent defects in the mortgage. The same immunity from defenses is extended to the mortgage as to the note.

As was cryptically said in *Newman* v. *Fidelity Savings & Loan Assn.,* 14 Ariz. 354, 128 Pac. 53:

"A negotiable note passes by indorsement carrying with it the mortgage collateral thereto."

The rule is stated in 1 Daniel on Negotiable Instruments, fifth edition, section 834, as follows:

"There is no doubt that a mortgage, or any other security given for the payment of a bill or note, passes by a transfer of the bill or note to the transferee. The doctrine has been laid down by a number of cases, and is stated by Mr. Hilliard, in his treatise on Mortgages, that if a mortgage is given to secure a negotiable note, and both the mortgage and the note are transferred before maturity to a *bona fide* indorsee, such indorsee takes the benefit of the mortgage as well as of the note, clear of any equities between the original parties. 'It is the debt which gives character to the mortgage, and gives the rights and remedies of the parties under it, and not the mortgage which determines the nature of the debt.' "

In 1 Jones on Mortgages, sixth edition, section 834, it is said:

"When, therefore, the debt secured is in the form of a negotiable note, a legal transfer of this carries

with it the mortgage security; and inasmuch as a negotiable promissory note by the commercial law, when assigned for value before maturity, passes to the assignee free of all equitable defenses to which it was subject in the hands of the payee, it does not lose this character which it has under the commercial law when it is secured by a mortgage. The mortgage rather is regarded as following the note, and as taking the same character; and it is the generally received doctrine that the assignee of a mortgage securing a negotiable note, taking it in good faith before maturity, takes it free from any equities existing between the original parties.''

In *Carpenter* v. *Longan,* 16 Wall. (U. S.) 271, 21 L. Ed. 313 (see, also, Rose's U. S. Notes), it was held that:

''An assignee of a note, and of a mortgage given to secure it, takes the mortgage as he takes the note, free from the objections to which it was liable in the hands of the mortgagee.''

It was there said:

''The transfer of the note carries with it the security, without any formal assignment or delivery, or even mention of the latter. If not assignable at law, it is clearly so in equity. When the amount due on the note is ascertained in the foreclosure proceeding, equity recognizes it as conclusive, and decrees accordingly. Whether the title of the assignee is legal or equitable is immaterial. The result follows irrespective of that question. The process is only a mode of enforcing a lien.

''All the authorities agree that the debt is the principal thing and the mortgage an accessory. Equity puts the principal and accessory upon a footing of equality, and gives to the assignee of the evidence of the debt the same rights in regard to both. There is no departure from any principle of law or equity in reaching this conclusion. There is no analogy between this case and one where a chose in action standing alone is sought to be enforced. The fallacy which

lies in overlooking this distinction has misled many able minds, and is the source of all the confusion that exists. The mortgage can have no separate existence. When the note is paid the mortgage expires. It cannot survive for a moment the debt which the note represents. This dependent and incidental relation is the controlling consideration, and takes the case out of the rule applied to choses in action, where no such relation of dependence exists. *Accessorium non ducit, sequitur principale.*"

This rule was followed in *National Live Stock Bank* v. *First Nat. Bank,* 203 U. S. 296, 51 L. Ed. 196, 27 Sup. Ct. Rep. 79 (see, also, Rose's U. S. Notes), wherein this language was used:

"The indorsement of the note and its delivery before maturity to the defendant by the payee of the note transferred its ownership to the defendant bank. This transfer also transferred, by operation of law, the ownership of the mortgage, which was collateral to the note. Such a mortgage has no separate existence, and when the note is paid the mortgage expires, as it cannot survive the debt which the note represents. *Carpenter* v. *Longan,* 16 Wall. (U. S.) 271, 21 L. Ed. 313; *Burhans* v. *Hutcheson,* 25 Kan. 625, 37 Am. Rep. 274; *Mutual Ben. L. Ins. Co.* v. *Huntington,* 57 Kan. 744, 48 Pac. 19; *Swift* v. *Bank of Washington,* 114 Fed. 643, 52 C. C. A. 339."

See, also, 7 Rose's U. S. Notes, page 1082, on *Carpenter* v. *Longan, supra,* where many cases are collated sustaining the rule under varying facts and circumstances.

The prevailing rule is stated in 11 C. J. 668, 669, sections 428, 430, as follows:

"428. The rule as laid down in most jurisdictions is that a *bona fide* assignee of a negotiable mortgage note, before maturity, and for value, will take the mortgaged property free from equities and defenses existing between the original parties to the mortgage, at least where the equities are secret or latent."

"430. It is a general rule that the *bona fide* assignee of a mortgage takes it free from latent or secret equities in favor of third persons of which he had no notice or knowledge. Thus a *bona fide* assignee, without notice, will take the mortgage free from the claims of creditors of the mortgagor, who had previously levied on the mortgaged property, or of creditors asserting that the mortgage was fraudulent as to them, or claiming a vendor's lien on the property, and from claims of prior mortgagees, or subsequent *bona fide* mortgagees or purchasers."

There is nothing in the record even suggesting that the plaintiff Finance Corporation knew that the affidavit of *bona fides* had not been made by or on behalf of the mortgagee exactly as it appeared on the face of the mortgage. On the contrary, the plaintiff was assured by the president of the mortgagor when questioned, that "the paper is absolutely clear and free from all defects." Nor do we think it a fair deduction to say that, because the plaintiff received on August 12th at Chicago a letter dated St. Louis, August 11th, from E. E. Overstreet, the plaintiff knew the affidavit was not made, "or wilfully ignored facts and circumstances from which knowledge could have been gained that E. E. Overstreet was not in Tempe, Arizona, on the twelfth day of August," as stated by the trial court.

In the first place, it is very improbable the date of the jurat was given any thought or attention when the mortgage was given into the hands of the plaintiff. In the second place, it is highly improbable the plaintiff's officers would ignore (wilfully or at all) a defect that would render their security void or even questionable, and pay out thereon the large sum of $100,000. In the third place, the reasonable thing for the plaintiff to assume was that the Mortgage Company and Kingsbury, in whom they had faith, would and had complied with the law. Finally, if

the affidavit was made on any other day than August the 12th, the fact that the jurat was dated the 12th would not affect its validity, the fact of making the oath and not its date being the essential thing.

Paragraph 4201 of the Uniform Negotiable Instruments Law (Civ. Code 1913), reads as follows:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts, that his action in taking the instrument amount to bad faith."

In *Foster* v. *Augustanna College & Theological Seminary,* 92 Okl. 96, 37 A. L. R. 854, 218 Pac. 335, it was held:

"The purchaser in good faith and for value of underdue negotiable paper is not chargeable with constructive record notice of defects and infirmities in the title of the transferer not apparent on the face of the instrument, the true test in such cases being the presence or absence of bad faith."

In *Fleming* v. *Drew,* 88 Okl. 160, 212 Pac. 306, it is said:

"In an action on a promissory note, by a purchaser in due course, for a valuable consideration, before maturity, the defense that the holder is not an innocent purchaser cannot be established by suspicion of defect of title or the knowledge of circumstances which would excite suspicion in the mind of a prudent man, or of circumstances sufficient to put him upon inquiry, but that result can be produced only by bad faith on his part."

See, also, *Wendling* v. *Aurelius-Swanson Co.,* 106 Okl. 63, 232 Pac. 932.

In 19 R. C. L. 355, section 126, is found this statement:

"While the interest of an assignee of a mortgage, where the obligation secured is not negotiable, is

generally subject to all defenses existing at the time of the assignment in favor of the mortgagor or his grantee against the assignor, the great weight of authority is to the effect that such interest is not affected with equities against the assignor in favor of third persons of which the assignee had no notice, for though it is the duty of the latter to inquire of the mortgagor, he is not required to inquire of the whole world as to latent equities. Accordingly a *bona fide* purchaser for value of a mortgage given without any consideration holds it as a valid incumbrance as against creditors of the mortgagor, since his equities are at least equal to theirs, and in such case the legal title prevails. Furthermore a *bona fide* purchaser of a mortgage, executed apparently on the same date between the same parties and upon the same property as was another mortgage, is not held to notice of latent equities in favor of the other mortgage by reason solely of the fact that the other mortgage was recorded after the purchased mortgage, but before the transfer.''

This is quoted with approval in *Maas* v. *Hesse*, 173 Wis. 74, 180 N. W. 343, the opinion stating it ''seems to be supported by the cases cited to the several propositions laid down.''

The trial court was of the opinion from the evidence that the plaintiff was not the holder of the note and mortgage in due course, ''but the actual lender, the actual mortgagee''—this notwithstanding its refusal to deal directly with the mortgagor and its fixed policy of making loans only through reliable banks or loan companies. To say the mortgagee was not in fact the mortgagee is to ignore that it had $40,000 in the mortgage. It was canceling the first mortgage on property for that amount, and to that extent the new mortgage was simply a substitute for the old. The Mortgage Company received every dollar plaintiff paid for note and mortgage, or directed its application.

This case is not analogous to those cases (cited by defendant) wherein a party purchases commercial paper from an agent of the maker or drawer with knowledge that the agency is limited to a negotiation thereof for the benefit of the maker or drawer. In such case the purchaser knows the agent has no title, or that his title is defective, and in a suit thereon by the purchaser he "manifestly cannot protect himself with the shield of a *bona fide* indorsee, but must meet such defenses as may be open to a drawer or maker against a payee." This rule is well established and is recognized in the following cases, and some others, cited by defendant: *Johnson* v. *Harrison,* 177 Ind. 240, 39 L. R. A. (N. S.) 1207, 97 N. E. 930; *Merchants etc. Nat. Bank* v. *Ohio Valley Furniture Co.,* 57 W. Va. 625, 70 L. R. A. 312, 50 S. E. 880. Here there is no question as to the *bona fides* of the transaction, and there is no defense whatever open to the maker of the note and mortgage. Moreover, the payee was not such nominally, but had a real substantial interest in the note and mortgage, if $40,000 may be so considered.

For business reasons perfectly apparent, the plaintiff, located in Chicago, but lending its money to the livestock industry scattered over several western and southwestern states, was compelled to depend upon local financial and business concerns, familiar with local conditions and laws and values, to make out the necessary papers and look after other details of loans, and that was what was done in this case. The plaintiff was neither in fact nor in law the mortgagee or the payee of the note; it was the indorsee for value and without any notice of defect in mortgage; its every act is characterized by good faith and honest dealing. Because it depended upon the mortgagee and the mortgagor to make out legal and regular commercial paper rather than going upon the ground

itself for the purpose, it did not constitute them its agents and is not bound by a hidden and secret defect in mortgage known only by the president of the mortgagee and the president of the mortgagor.

That it may not be contended hereafter that we have ignored the trial court's findings of fact, we will state that the record does not show any findings of fact were made, as required by law. There is found in the record a paper headed "Memorandum of Decision; Statement of Case." It is in fact the court's written opinion, in which is set forth some of the evidence, which is analyzed and discussed, and from it certain legal conclusions are drawn. The statute, paragraph 528, Civil Code of 1913, provides that:

"The court may in any case, and shall, at the request of either party, make written findings of fact, stating the facts found by the court and the conclusions of law separately."

We have held in a number of cases that the court's reasons for its decision contained in a written opinion does not conform with this statute and may not be accepted as findings of fact. *Deatsch* v. *Fairfield,* 27 Ariz. 387, 38 A. L. R. 651, 233 Pac. 887; *Watson* v. *Ocean Accident & Guarantee Co.,* 28 Ariz. 573, 238 Pac. 338. However, it is not the facts set out in the opinion with which we do not agree, but the deductions drawn therefrom.

We are strongly of the opinion the judgment denying the plaintiff the right to foreclose its mortgage was erroneous and for that reason it is reversed and the cause remanded, with directions that judgment of foreclosure be entered and such other proceedings be had as are not inconsistent with this opinion.

McALISTER, C. J., and LOCKWOOD, J., concur.