## PARSONS *vs.* MONTEATH & HAZARD.

The defendants, being common carriers on the Erie canal, between Albany and Buffalo, and occupying a warehouse on the pier at Albany, their agent in New-York received goods there, belonging to the plaintiff, and gave a receipt or shipping-bill therefor, in the name of the defendants, by which they agreed to transport the goods to Brighton Locks, " the danger of the lakes, *of fire*, &c. and acts of Providence excepted." The goods reached Albany on the morning of August 17, 1848, and were taken from the tow-boats into the defendants' warehouse on the pier. On the same day a fire originated in the city of Albany, by some accident, a quarter of a mile from the defendants' warehouse. The wind increased and carried the flames to a great distance. The warehouse was consumed, and the plaintiff's goods, being removed by the defendants' agent into a canal boat in the basin, were destroyed by the fire.

*Held*, 1. That the loss was produced by natural causes, and not by inevitable accident, or the act of God.

2. That the defendants sustained the relation of common carriers of the goods, at the time the fire broke out, and when the goods were destroyed; and that the rules of law incident to that relation applied to them.

3. That the defendants had a right to circumscribe or limit their common law liability as common carriers, by agreement; and that having expressly excepted the risk of loss by *fire*, they were not liable for the value of the goods. *Gould* v. *Hill*, (2 *Hill*, 623,) overruled.

THIS was an action brought by Parsons, the respondent, to recover from Monteath & Hazard, the appellants, as common carriers, the value of certain goods belonging to the respondent. After the issue was joined between the parties, the action was referred to the Hon. F. Whittlesey as sole referee, who made a special report in favor of the plaintiff, upon which judgment was accordingly entered at special term. The report of the referee was as follows :

" To the Supreme Court :

This cause having been referred to the subscriber, Frederick Whittlesey, as sole referee, I do report that I have been attended by the counsel for the respective parties, and heard the proofs and allegations offered by them respectively, and their arguments thereon ; and after duly considering the same, have come to the conclusions and determinations hereinafter mentioned. The case made by the pleadings and proofs is as follows : The complaint charges the defendants as common carriers, who, as such,

received the property of the plaintiff, to carry from New-York to Brighton Locks in Monroe county, and that, by their carelessness and negligence, certain of such property, of the value of $280, was lost. The first answer to the complaint was that the defendants did not receive the goods to transport; which was subsequently amended by adding that the goods were lost by inevitable accident, or the act of God. The proofs establish the following facts : The defendants were partners under the name of William Monteath & Co., and were common carriers on the Erie canal between Albany and Buffalo, and occupied a warehouse on the pier at Albany. The defendants were proprietors of the Clinton line of canal boats on the Erie canal. They had an agent in New-York to procure freight to be carried by the line of canal boats, and give receipts therefor in New-York. Such freight was forwarded from New-York to Albany by the river tow-boats—discharged from the tow-boats on the east side of the pier at Albany, into the defendants' warehouse on the pier—and from such warehouse into canal boats in the canal basin on the west side of the pier. The defendants had no interest in the tow-boats on the Hudson river, and were not common carriers thereon. In August, 1848, O. P. Scovill was the defendants' agent in New-York. In that month the plaintiff, by his agent, purchased some salt petre and brimstone in New-York, and directed it to be forwarded to him by the Albany and canal line of tow-boats, and to have a receipt taken for it and sent to him. The following receipt or shipping-bill was given for the property, viz. :

" *Clinton Line,*

" William Monteath & Co., 100, Pier, Albany, proprietors.

" New-York, August 15, 1848.

" M. Parsons,   " Rochester, N. Y.

" To be left at   " Brighton Locks.

" Received on board the Albany and Canal line tow-boats the following articles in apparent good order, viz. :

" 50 fifty bags salt petre.

" 5 five barrels of rolled brimstone.
—
" 55 packages.

Parsons *v.* Monteath.

"Marked as per margin; which we agree to transport to Brighton Locks, (the danger of the lakes, of fire, breakages of looking glasses, leakage of oil, and acts of Providence excepted,) at the rate of thirty-eight cents per 100 lbs.

"W. MONTEATH & Co.

"By O. P. Scovill, agent, 113 Broad-street, New-York."

The signature to such receipt or shipping-bill, "W. Monteath & Co." was printed. The signature, "O. P. Scovill," was in his hand-writing. These goods reached Albany on the morning of August 17th, 1848, and all, or a portion of them, were taken from the tow-boats into the defendants' warehouse on the pier. On the same day, August 17th, a fire originated in the city of Albany by some accident, a quarter of a mile from the defendants' warehouse. It was very dry, and the fire spread rapidly. The wind increased so as to blow with great violence; burning fragments of wood were carried a great distance by the wind, and communicated the fire to different places. The defendants' warehouse, with other warehouses on the pier, extending 1000 or 1200 feet in length, were consumed, and many canal boats in the canal basin. Human efforts to arrest the progress of the fire were without effect, and there was a very extensive conflagration in the city. The brimstone belonging to the plaintiff was removed by the defendants' agent into a canal boat in the basin, and was there destroyed by the fire. Some of the salt petre was either not removed from the tow-boats, or was again taken from the warehouse into the tow-boats and saved; but 16 bags of it were destroyed in the warehouse. The value of the goods destroyed was $280.

From the case thus made by the proofs, I deduce the following conclusions of law as applicable thereto. 1. The defendants are bound by the receipt or shipping bill executed by them by their agent O. P. Scovill, and that such paper was properly executed to bind the defendants. 2. That the defendants being common carriers on the Erie canal, received the property in question as common carriers, at least as soon as it was taken from the tow-boats into their warehouse in Albany, if not before. 3. That, as common carriers, they were insurers of such prop-

Parsons *v.* Monteath.

erty from the time of such receipt, against all losses, except by inevitable accident, or the act of the public enemy. 4. That the loss by the fire, as exhibited in the proofs, is not a loss by such inevitable accident as will excuse the defendants from liability. 5. That the defendants, being common carriers, cannot stipulate for exemption from liabilities for loss by fire, and therefore that the exception in relation to exemption from liability for such loss, contained in the receipt or shipping bill, will not protect them. The last position I am constrained to adopt from the authority of the case of *Gould* v. *Hill*, (2 *Hill*, 623,) deeming, from that case, that such is the established doctrine in this state at present, which I am not at liberty to disregard; though I do not personally approve of the doctrine as applicable to a case like the present. I therefore report that the plaintiff is entitled to recover from the defendants, the sum of two hundred and eighty dollars."

*S. H. Hammond,* for the appellants, contended, I. That the destruction of the property, under the circumstances, was an inevitable accident, or *the act of God.* That the fire, at the place where the goods were at the time they were burned, was occasioned by the increase of the wind, after it had commenced burning some quarter of a mile distant. II. The carrier had a right to protect himself from loss. He did so by the special provisions of the receipt or shipping bill, and the plaintiff is bound by it.

*W. S. Bishop,* for the respondent, contended for the reverse of the appellants' propositions.

*By the Court,* WELLES, J. The first point made by the appellant, to wit, that the loss of the goods was the consequence of inevitable accident, or in other words, by the act of God, cannot be maintained; after the fire had commenced burning, I am satisfied that no human effort could have arrested it, and that no want of care is chargeable to the defendants, or their agents. But they sustained the relation of common carriers of the goods in question at the time the fire broke out, and when the goods

Parsons *v.* Monteath.

were consumed, and the rules of law incident to that relation applied to them. The act of God, as it is called, in order to excuse a common carrier, must be such an event as could not happen by the intervention of man, nor be prevented by human prudence. (*Angell on the Law of Carriers*, § 156.) The case of *Colt* v. *McMechen*, (6 *John*. 160,) which is principally relied upon by the defendants' counsel, is plainly distinguishable from the present. In that case the defendant's vessel in which the plaintiff's goods were lost, was beating up the Hudson river against a light and variable wind, and being near the shore, and while changing her tack, the wind suddenly failed, in consequence of which she ran aground and sunk. It was held to be the act of God, and the carrier was excused. Spencer, justice, in that case, in speaking of the case of *Amies* v. *Stevens*, (1 *Str*. 128,) where a sudden gust of wind, by which the hoy of the carrier was driven against a pier and sunk, and which was adjudged to be the act of God, or *vis divina*, observed that "the sudden gust in the case of the hoyman, and the sudden and entire failure of the wind sufficient to enable the vessel to beat, are equally to be considered the act of God. He caused the gust to blow in the one case; and in the other, the wind was stayed by him."

The motion of the wind is entirely unconnected with and independent of any human agency. So in some cases with respect to fire, as in the case of lightning, or a volcano, &c. But that cannot be said of the fire in this case. It does not appear by whose or what means the fire originated, and in such case, the presumption is against the carrier, that the fire arose from some act of man, unless he shows that it could not have so arisen. Such presumption arises out of considerations of public policy in relation to this class of carriers. (*Angell on Carriers*, § 156, *and authorities there cited*.) Scarcely a case can be imagined of a loss of property not produced in whole or in part by natural causes, or the action of the elements. The distinction, I apprehend, in reference to the common carrier's liability, is between cases, where the elements are set in motion by human agency, and where they are not. (*Story on Bail*. §§ 511, 582, *and authorities there cited*.)

But the most interesting and important question in the case, arises under the defendants' second point, viz. whether a common carrier has a right by special contract, to circumscribe or limit his common law liability. Such was the contract between the parties in this case, and if effect is to be given to it, the defendants are not liable.

Were it not for the late case of *Gould* v. *Hill,* (2 *Hill,* 623,) I should have no hesitation in holding the contract between the parties as valid and binding, and one to which we were bound to give effect. To do so would be in accordance with a long and unbroken course of decision in England and in many of our sister states, and in all of them, I believe, where the question has arisen, excepting Ohio; and would be in harmony with the views of all the elementary writers on the subject. (*Story on Bail.* § 549, and authorities in ref. 4. Chitty on Cont. 152, Boston ed. of 1827, and authorities cited. 2 Kent's Com. 606. Angell on Carriers, §§ 59, 220, 221, and authorities cited.*)

It is unnecessary to go into a particular examination of the authorities here cited. I content myself with the remark, that the doctrine is fully asserted by Story, Chitty, Kent and Angell, and most abundantly sustained by the authorities to which they refer. But in the case of *Gould* v. *Hill,* (*supra,*) Justice Cowen held a contrary doctrine; that it was not competent for a common carrier to restrict, by special contract, his common law liability; and that where the defendant, being a common carrier, on receiving the plaintiff's goods for transportation, gave him a memorandum by which he promised to forward the goods to their place of destination, *danger of fire, &c. excepted,* the defendant was liable for a loss by fire although not resulting from negligence. The learned justice puts his decision wholly on the ground of public policy; and refers to his reasoning in the case of *Cole* v. *Goodwin,* (19 *Wend.* 251,) the substance of which is, (*p.* 281) that a common carrier's business is of a public nature; that he is a public servant and bound to perform the duties of his office, and that he should no more be permitted to limit or vary his obligations or liabilities by contract than a sheriff, or jailer, or any other officer appointed by law.

Parsons *v.* Monteath.

The only question with me is how far we are bound by the case of *Gould* v. *Hill,* and whether the maxim *stare decisis,* in consequence of it, is to govern the present case. It is the only reported case where this precise question has been decided in that way in this state. No case, that I am aware of, has followed it, affirming the doctrine. Nelson, then chief justice of this court, dissented from the decision. I am disposed therefore to think, in view of the great importance of the question and its connection with so large a branch of the commerce of the country, that we ought to take the responsibility of overruling it, providing we think it not in accordance with the settled law of the land. It is a question in relation to which, almost above all others, the law should be uniform throughout the commercial world, especially among the different states of the Union. It relates to transactions which in their nature expand themselves over and through extensive districts of country, and to places widely separated from each other. No one can fail to perceive the great inconvenience that must result from having different and hostile rules on the subject, prevailing between the different Atlantic cities, or between them and the western states. If it be true, as I think is undeniable, that by the law as entirely settled in England, and in most of the United States, and as held by the most eminent jurists of the country, a common carrier may, by special contract with his employer, limit his liability, and relax the rigor of the common law rule applicable to his position, I think we ought not to hesitate in giving the law, so declared, effect in the case at bar, notwithstanding the isolated authority in this court, which stands opposed to it. I think the rule as laid down by Justice Cowen, should be regarded as a deviation from the true one, from which the court should return at the earliest opportunity, and that too, notwithstanding we might, were the question entirely open, prefer a different one.

But it seems to me there is no good reason why such a contract between the carrier and the owner of goods should not be enforced. The only one I have ever seen or heard is the one of public policy, founded upon the interests of commerce and

Parsons *v.* Monteath.

the protection of the consignors and consignees of property. This I apprehend is entirely too imaginative. Men of business generally know what they are doing and what is for their interest. If common carriers are to be insurers against accidents and events which it is out of their power to prevent, and which their employers do not insist they shall incur, they will as a matter of course charge higher freight. If the owner of the goods wishes, or is willing for any reason to incur the risk, it is impossible for me to perceive why he should not be permitted to do so. It is enough that the law settles the rule of liability where the parties to the affreightment have neglected to do it by contract. If I have goods to transport, and the common carrier tells me he will carry them for a particular price without incurring the risk of loss or damage by inevitable accident, but that if he takes such risks, he must add a per centage to the price of transportation, I really cannot see what the public have to do with our negotiations, nor why we should not be permitted to make a valid contract, with such conditions and stipulations as we choose. A contract which should excuse the carrier from liability for damage or loss arising from his own fraud or gross negligence, would not be enforced. It would be *contra bonos mores,* and void. So of contracts for the violation of any law, common or statute. If it be said, as has been said, that to give effect to the stipulation in the contract restricting the carrier's liability to accidents which diligence and good faith on his part can prevent, (which is all I contend for,) would be to hold out to packet masters a premium for indifference, or carelessness, or want of vigilance in protecting shipments confided to their care, I reply that the argument is a *non sequitur.* In all such cases, the carrier would be bound to satisfy a jury that he had exercised diligence and faithfulness in the performance of his contract. The burthen of proof would rest upon him, and not upon the owner of the goods, who would in the first place only be bound to prove their shipment and the loss or damage.

I think it should be open to parties by special agreement, to waive rules of law, and liabilities introduced and enforced for their own benefit. Although, for the purpose of protecting the

public from deceit and pretended losses, the common law responsibility of a carrier is peculiarly extensive, still, if the party intrusting goods to his care, agree to restrain such liability, there can be no legal or equitable reason, in my opinion, for holding that the carrier is bound beyond the terms agreed upon, in the absence of fraud or gross and actual negligence on his part.

In every light that I have been able to view the question, I am forced to the conclusion that the rule in *Gould* v. *Hill* is not, and ought not to be, the law. That it is opposed to reason as well as to authority, and ought not to be followed. As my brethren concur with me, it follows that the judgment at special term should be reversed, the report of the referee set aside, and a new trial before the same referee granted, with costs to abide the event.

[Monroe General Term, June 3, 1851. *Welles, Taylor* and *Johnson,* Justices.]