JUDGE ELLIOTT
delivered the opinion oe the court.
On the 11th of October, 1877, the appellees Brownlee and Wells brought this action for the recovery of the value of three hogsheads of tobacco, which they alleged had been consumed by fire while in possession of appellant’s agents, and by *593 tbeir negligence, at Rowlett’s Station, a depot or station on appellant’s railroad.
On the 16th of June, 1*877, the appellees by their teamster, a colored man, delivered to appellant’s agent at its depot at Rowlett’s Station, two hogsheads of tobacco. The appellant’s agent filled up and delivered to the teamster, on the delivery of each hogshead of tobacco, a printed freight-bill, which, in addition to the acknowledgment of the receipt of the freight, contained a contract, limiting the common-law liability of appellant as a common carrier in several particulars, and among others contained the following provision: “That the said Louisville & Nashville Railroad Company shall not be liable for loss or damage on any article of property whatever, by fire or other casualty while in transit or while in depots, or landings at points of delivery, etc.”
On the 18th of the same month and year the appellees, by the same teamster, delivered another hogshead of tobacco, and received a similar freight-bill or receipt for the same.
On the 19th of June, 1877, the warehouse in which this tobacco was stored at Rowlett’s Station, was consumed by fire at near two o’clock in the morning, and appellee’s tobacco was consumed with it.
According to the evidence there was a stove in the depot-building, but there had been no fire in it for several months.
The last trains that passed the depot before the fire were two that passed each other at that station at about eight o’clock and fifty minutes on the night of the 18th, some four or five hours before the fire. At between eleven o’clock and midnight the appellant’s agent went to his boarding-house, some few hundred yards distant, and retired for the night, and at some minutes after one o’clock, A. m. of June the 19th, another train approached Rowlett’s depot, and its passengers discovered the warehouse on fire.
The depot-buildings at Rowlett’s Station were all built of *594 wood, and covered or roofed with shingles, and a good many rags were scattered over the warehouse-floor at the time it caught fire. How, or precisely wlften, the warehouse took fire, appears to have been a matter of mere conjecture with the witnesses.
The colored man who delivered the tobacco proves that he received the freight-receipts, and delivered two of them to appellee Brownlee on the 16th of June, being the day of their date, and that he delivered the other one to Brownlee on the 18th of the month, the day of its date, and the appellee, Brownlee, proves that he received them at those dates.
By this teamster it is also proved that he, on the delivery of the hogsheads of tobacco on the 16th of June, informed the appellant’s agent at the depot that the consignors wished them shipped so soon as it could be done to Louisville, as they wished them there by the 19th of the month at the farthest, and there is evidence conducing to prove that the appellant’s agent promised to ship the tobacco by that time.
Appellant’s agents, Havey and Rowlett, prove that at no time after they received the first two hogsheads of tobacco could they have shipped more than one of them before the burning of the warehouse. And they prove that the train on which appellant ships freight to Louisville passes the depot each morning at 10:35, and that at that time on the morning of the 18th of June the last hogshead of appellee’s tobacco had not reached it, and could not have been shipped before the next morning, and before that time it was all burned up.
These agents state that by the regular course of business of the railroad company, appellee’s tobacco could have been shipped on the freight train passing Rowlett’s depot at 10:35 A. m. Tuesday, June the 19th, and not sooner.
On the trial, verdict and judgment were rendered for appellees, and the defendant by this appeal questions the correctness of the judgment on various grounds, but chiefly on *595 account of the instructions which it is asserted were erroneously given at appellees’ instance, and those which were refused when offered by appellant.
At appellees’ instance, by instruction No. 1, the jury were told that if “ they shall believe, from a preponderance of the evidence, that the defendant received plaintiffs’ tobacco, and agreed to transport the same to Louisville, and deliver the same to plaintiffs’ consignee, then it was the defendant’s duty to provide a safe depository for the same and to use ordinary care and diligence in taking care of and shipping the same according to their contract, and if defendant failed to do so and plaintiffs’ tobacco was lost to them on account of defendant’s failure to provide for such tobacco such depository, and shipping the same within a reasonable time, the law is for the plaintiffs, and the jury should so find and give the plaintiffs such damages as they may believe from the evidence plantiffs have sustained, not exceeding the value of the tobacco lost.”
It is contended by the appellant that this instruction was erroneous, because it not only required the appellant to use proper vigilance and diligence in taking care of and shipping the tobacco, but in addition made it its duty to provide a safe depository for the same, which, in effect, authorized the jury to find against it, although its agents may have stored the tobacco in a warehouse considered safe by ordinarily prudent men, unless the jury believed that such depository was actually a safe one. We think the criticism of this instruction is correct, unless the liability of appellant has not been limited by the special contract relied on by it.
Webster, in his lexicon, defines the word safe to mean “free from danger of any kind, as safe from enemies, safe from disease, safe from storms, safe from the malice of foes,” etc.
To make it the duty of appellant’s agents to provide a safe depository for appellees’ tobacco was requiring them to store it in a place where it would be free from danger of any kind, *596 and although the appellant’s agents may have stored the tobacco in a place considered free from danger by prudent men engaged in like service, still if it was not actually so, the jury were authorized to find for the appellees.
In other words, if the depository of the appellees’ tobacco was not actually safe, although so considered by prudent men engaged in such' business, the' storing it in such depository according to this instruction, authorized the jury to find for the plaintiff on the ground of negligence in defendant’s agents in storing the tobacco.
Under this instruction the jury may have believed that they were authorized to find that no warehouse constructed of wood and covered with shingles was a safe depository for the tobacco of the appellees, and on that ground rendered a verdict for them, although abundant authority can be found in support of the position that wooden warehouses roofed with shingles, when managed and controlled by prudent agents, are considered lawful depositories for the storage of goods at railroad depots and other places.
There can be no doubt but that the appellant’s agent, on the receipt of each hogshead of appellees’ tobacco, delivered to their agent a bill of lading containing a contract restricting their liability as common carriers, and that such agent delivered these bills of lading to his principals on the day he received them, but it is contended by appellees that they ought not to be bound by them, because they neither read nor assented to them.
In Mulligan v. The Illinois Central Railroad Company, 2 American Railway Reports, 322, it was held that “ A bill of lading, like a deed-poll, and many other classes of contracts, is signed by one party only, and in such case the evidence of assent upon the part of the other party usually consists in his accepting and acting upon it, and the evidence of assent, derived from his acceptance of the contract without objection, is usually conclusive.”
*597 The court further say that, “ From an acceptance of this paper, without protest or objection, the defendant had a right to presume that plaintiff assented to its terms. It would therefore operate as a fraud to permit plaintiff now to say, ‘ I did not read the bill of lading, and was not aware of its contents; did not know that you undertook to limit your liability to Cairo, and did not assent that you should do so.’ It not appearing that any fraud or imposition was practiced, nor that any mistake intervened, the plaintiff must be conclusively presumed to have become acquainted with its contents; and if he did not do so, the consequences of his folly and negligence must rest upon himself. Courts can not undertake to relieve parties from the effects of such inattention and want of care. If once they should enter this doubtful domain, it is impossible to foresee to what length their interference might be pressed, or of what limits it would finally admit.”
Judge Cooley, in McMillan, &c. v. M. S. & N. I. R. R. Co., 16 Michigan Reports, 79, says, in substance, that common carriers first undertook to limit their common-law liability by printed notices posted up at the depots and warehouses; but he' says, “The courts in this country have generally held these notices ineffectual.”
He, however, says, “ If, on the other hand, the carriers can make it the interest of the party to relieve them from this liability wholly or in part, a contract to that effect, if fairly made, and embracing no unreasonable conditions, is not opposed to public policy, and to forbid it would seem an unnecessary restraint upon freedom of action.” A much more difficult question is: What shall constitute proof of a contract, in the absence of distinct evidence, that the parties have consulted and agreed upon terms ? The practical difficulty, amounting almost to an impossibility, of bringing the carrier and his employer together on every'occasion for discussion of terms, has led to the adoption, by carriers, of a printed form of con *598 -tract, which is put into the hands of the consignor, and by its terms purports to bind him to its conditions; but it is strongly insisted that there ought to be more satisfactory evidence of assent on the part of the consignor to modify any of his common-law rights than is derived from the mere receipt of a paper from the carrier framed to suit the interest of the latter, and which the consignor may never have read.”
The learned judge then assents to all that was said by the court in Mulligan v. Illinois Central Railroad Company, as to the validity of such contracts, and says: “I do not find a case in which a court has assumed to set aside such a contract, on the ground that the party had failed to read it. An exemption from liability from losses arising from specified causes, when embodied in the bill of lading, has been frequently recognized as a part of the contract, though it did not distinctly appear to have been brought to the consignor’s notice. (Davidson v. Graham, 2 Ohio (N. S.), 131; Parsons v. Monteith, 13 Barb. 353; New York County v. Central R. R. Co., 3 Wall. 107; Dorr v. N. J. Steam Nav. Co., 11 N. Y. 491.) And in the case last referred to it is said that the exemption, when embodied in the bill of lading, must be deemed to have been assented to by the parties. The same presumption would seem to have been acted upon in Moore v. Evans, 14 Barb. 524; Kallman v. Ex. Co., 3 Kan. 205; and Whitesides v. Thurlkill, 20 Miss. 599; and it is in accordance with the general rule applicable to written contracts.”
The cases cited are only a few of those in which it has been held by the courts of the different states that the receipt by the consignor of a bill of lading, containing a contract restricting or limiting the common-law liability of a common carrier in the absence of fraud or mistake, is binding on him, whether it is read by him or not. All the authorities hold that the consignor is not bound to accept or agree to the terms of the special contract in restriction of the carrier’s liability, but in *599 such cases it is his duty to refuse to accept the written instrument limiting such liability by returning it to the carrier after he has had time to ascertain its contents, with notice of his non-acceptance.
The weight of authority, both in this country and England, is that by receiving and accepting the bill of lading the consignor becomes bound by its terms, in the absence of fraud or mistake. In this case two of the bills of lading were received by the appellee Brownlee two days before the fire, and the other one the day before, and they are retained by him without notice of non-acceptance or repudiation till after the destruction of appellant’s warehouse and its contents.
On the 16th of June the appellees’ teamster delivered two hogsheads of tobacco, one in the morning and the other in the evening, and on each return trip he delivered to Brownlee the bill of affreightment which he had received from the appellant’s agent. If unwilling to abide by the terms of these bills of lading, Brownlee could have returned the first one by this teamster, who delivered the second hogshead, and thus evidenced his non-acceptance of the proposed'Herms of the carrier. The teamster could neither read nor write, but Brownlee could do both, but says he only looked at the bills of freight to ascertain the weight of the hogsheads. Having received these contracts and retained them without objection till after the fire without any pretense of fraud or imposition on the part of the agents of the company, or mistake as to their terms, appellees can not avoid their force merely because they failed or refused to read them, and this ruling is sustained by almost all the authorities on the subject, both English and American.
A more serious question has been mooted as to how far common carriers can limit their liability by special contract. In Dorr v. the New Jersey Steam Navigation Company, 4 Sandford, 136, Judge Campbell delivering the opinion of the court, said: “A common-carrier has in truth two distinct lia *600 bilities, the one for losses by accident or mistake where he is liable as an insurer, the other for losses by default or negligence, where he is answerable as an ordinary bailee. It would certainly seem reasonable that he might by express special contract restrict his liability as insurer, that he might protect himself against misfortune even though public policy should require that he should not be permitted to .stipulate for impunity where the loss occurs from his own default or neglect of duty, and such we consider to be the law in the present case.”
In Story on Bailments, 544, after quoting the conflicting authorities, it is said: “The question may, however, be now considered at rest by an adjudication entirely satisfactory in its reasoning and turning upon the very point in which it was held that in' notices (special, contracts) the carrier is liable for losses and injuries occasioned not only by gross negligence, but by ordinary negligence. In other words, the carrier is bound to ordinary diligence.”
The doctrine that common carriers can limit their common-law liability by special contracts has received the sanction of this court (see 2 Duv. 554; 11 B. Mon. 336), but not to such extent as to relieve them from liability for the negligence of themselves or their agents.
It is now considered the settled doctrine, sustained, too, by reason and the weight of authority, that common carriers may restrict their liability as insurers by' special contracts with their customers, but can not, by contract or otherwise, obtain exoneration from loss which is the result of the negligence of themselves or agents.
We think the appellant was only bound to use ordinary care and prudence in providing a depository for appellees’ tobacco, and also such care and prudence in shipping it; and we are of opinion that the duties of appellant are properly defined by instructions Nos. 4, 5, 6, and 7 offered by it, and rejected by the court.
*601 If the appellant could, by the use of ordinary diligence, and in the regular course of its freight business, have shipped the tobacco before its consumption by the fire, it is responsible for its failure to do so, or if it failed to use ordinary precaution and vigilance in storing appellees’ freight, or in avoiding the fire which consumed it, it is responsible for the consequences.
Wherefore the judgment is reversed, and cause remanded fox further proceedings not inconsistent with this opinion.