245 P.2d 268

**RIDGWAY v. SUPERIOR COURT OF YAVAPAI COUNTY et al.**

No. 5640.

Supreme Court of Arizona.

June 9, 1952.

Richard H. Chambers and E. T. Cusick, Tucson, and Jesse A. Udall, Safford, for petitioner.

Favour & Quail, Prescott, for Superior Court of Yavapai County, W. E. Patterson, Judge, respondent.

John J. Flynn, Dix W. Price, and Allan K. Perry, all of Phoenix, for Superior Court of Maricopa County, Charles C. Bernstein and Fred C. Struckmeyer, Jr., Judges, respondents.

LA PRADE, Justice.

This proceeding was instituted directly in this court by petitioner George Ridgway, Superintendent of the State Industrial School for Boys at Fort Grant, Arizona, asking for a writ of prohibition against the Superior Court of Yavapai County, Arizona, W. E. Patterson, Judge thereof, and the Superior Court of Maricopa County, Charles C. Bernstein and Fred C. Struckmeyer, Jr., Judges thereof, hereinafter called respondents, to compel respond-

ents to cease and desist from proceeding in certain contempt proceedings then and now pending in said courts against petitioner. An alternative writ of prohibition was issued by this court and the matter is now before us on motions to quash the alternative writ.

The petition for the writ showed that the Honorable W. E. Patterson, Judge of the Superior Court of Yavapai County, Arizona, had theretofore issued separate rules to show cause and directed petitioner and three present employees and one former employee of the school to show cause in the Superior Court of Yavapai County, Arizona, why they should not be held in contempt of that court for subjecting two juveniles, theretofore committed by that court, to cruel, unusual and inhuman punishment. The rule asserted that the alleged conduct of the Superintendent and the employees was a wilful violation of the orders of the court.

While these proceedings were pending, the Honorable Charles C. Bernstein, one of the judges of the Superior Court of Maricopa County (presiding as Juvenile Judge), issued an order to show cause against petitioner and four present and two former employees of the school. This order to show cause asserted that in connection with the disciplinary methods of petitioner and his subordinates the orders of the court, the Constitution and the statutes of the state were being violated. In these charges some 18 wards committed to the school were alleged to have been mistreated in connection with disciplinary procedures at the school.

The rules to show cause from the Yavapai Court, directed to petitioner, charged that he was an officer of the court and that in such capacity he had subjected the named wards to cruel and unusual punishment in that he caused them to be subjected to corporal punishment exceeding the bounds of reasonable discipline, to wit: floggings, being compelled to walk long distances in bare feet and forced to work in briar patches barefooted at a time when their feet were blistered. Other charges were designated as cruel and unusual punishment, the specifications being that the wards had been subjected to ridicule by having their hair cut and clipped; deprived of food for two consecutive meals and compelled to stand at attention in the mess hall without food while other wards were eating their meals; to humiliation and fear by having directed to them opprobious epithets; being compelled to witness the striking of other wards and hearing threats of punishment made to them; that the named employees had appeared in the presence of the wards under the influence of liquor, thereby subjecting them "to care and environment contrary to his commitment and contrary to the moral welfare of said minor".

The order to show cause issued by Judge Bernstein directed petitioner and others to show cause before Judge Struckmeyer

"why the orders and judgments of this Court and the laws of Arizona had not been obeyed relating to said wards of this Court, all by reason of the acts set forth in the affidavits on file herein and attached hereto".

The affidavits referred to charged as cruel and unusual punishment striking, beating and kicking of certain children, requiring them to walk long distances without shoes, food and adequate water, to work in sticker patches without shoes, shaving of heads, using obscene and vile names in the presence of wards, etc.

The petitioner asserts that a superior court is without jurisdiction to institute or prosecute proceedings in contempt for any of the matters or things set forth in the several rules to show cause directed against him and the other named employees.

Respondents, in support of their motions to quash the alternative writ, and relying on the case of Howard v. State, 28 Ariz. 433, 237 P. 203, 40 A.L.R. 1275, contend that the courts have jurisdiction to proceed by contempt for violation of their orders.

At this juncture, it might be well to observe what were the specific orders alleged to have been violated. The commitment from the Yavapai court recited that a petition had been filed against the named child charging him with being a delinquent, that a hearing was had; that the court found that he was a delinquent child, naming the particulars, and that he was a minor subject to the provisions of the juvenile court laws of the state, and then decreed:

"It is therefore ordered, adjudged and decreed that the said Frankie Holt be and he is hereby committed to the Industrial School for Boys located at Fort Grant, Arizona, for the period of his minority, unless sooner discharged by due process of law. It is further ordered that this Court retain jurisdiction over said minor."

The Maricopa commitment was to the same general effect and, in addition thereto, provided that

"A certified copy of this order shall be a warrant for the Sheriff of Maricopa County to deliver the said child to the said Industrial School, and for the authorities of said Industrial School of the State of Arizona to receive and keep said child as herein ordered and provided."

It is our opinion that these commitments are no more nor no less than orders to receive and keep the named child for the period of his minority unless sooner discharged by law.

Respondents contend that under the provisions of the Constitution and applicable statutes the juvenile court has exclusive and continuing jurisdiction in all proceedings and matters affecting delinquent children, and as a consequence can punish a disobedience of its order in relation thereto by contempt proceedings. The applicable

portion of the Constitution (Art. 6, Sec. 6), in part, reads as follows:

" * * * The superior court shall have exclusive original jurisdiction in all proceedings and matters affecting dependent, neglected, incorrigible, or delinquent children, or children accused of crime, under the age of eighteen years. * * * The powers of said judges to control such children shall be as prescribed by law. * * * "

The statutory provisions (Juvenile Code) are to be found in Chapter 80 of the Session Laws of 1941, the various sections of which have now been given arbitrary section numbers in the Supplement to the Arizona Code Annotated, 1939. The applicable code provisions are:

Section 46–118, *Jurisdiction of juvenile court,* is a rescript of the constitutional provision just quoted.

Section 10 of said Chapter 80, Session Laws of 1941, section 46–125, is entitled *Disposition of Child.* (This section was attempted to be amended by Chapter 13, Session Laws 1951, but is now held in abeyance, referendum having been filed against it.) It specifically authorizes the commitment of children to various institutions including the State Industrial School.

Section 46–132, Code Supplement, in part provides as follows:

"(a) When jurisdiction has been obtained by the juvenile court in the case of any child, the child shall continue under the jurisdiction of the court until he becomes twenty-one (21) years of age, unless sooner discharged. No commitment shall divest the court of jurisdiction for the purpose of enforcing its judgments and orders. No commitment of any child shall extend beyond the minority of the child, and commitments to the state industrial school or a school or institution for girl juvenile offenders shall be for the term of the child's minority, unless sooner discharged."

By Chapter 98, Session Laws of 1952, (effective June 26, 1952) this section was amended by striking therefrom the sentence:

"No commitment shall divest the court of jurisdiction for the purpose of enforcing its judgments and orders."

and in lieu thereof, there was inserted a sentence referring to committed children, as follows:

"A child shall be subject to the exclusive control of the board of directors of state institutions for juveniles until his absolute release."

Section 46–136, *When board may release child,* authorizes the board of directors of state institutions for juveniles to issue an absolute release of a child when certain conditions exist. Under the provisions of this section, as originally enacted by Chapter 80, Session Laws 1941, the board could not release except with the consent of the court. This section was amended by Sec–

tion 2, Chapter 28, Session Laws 1945, vesting the board with the sole power to release.

Section 46–139, *Contempt*, reads as follows:

"Any person who wilfully violates or neglects or refuses to obey or perform any order of the juvenile court may be proceeded against for contempt."

This section was in effect at the time these contempt proceedings were initiated, but has now been repealed. (Sec. 3, Ch. 98, S. L.1952, effective June 26, 1952.)

For the past 50 years the state has maintained an institution for the confinement, discipline, education, employment and reformation of juvenile delinquents. See Section 3733, Revised Statutes Arizona 1901. The general supervision and government of the institution was vested in a board of trustees.

Under our existing statutes, we have institutions for juvenile offenders under the government, management and control of a board. By the provisions of Section 47–402, A.C.A.1939,

"The *government* of state institutions for juvenile offenders *and the administration of laws for the detention, education* and *treatment* of juvenile offenders *is vested in the board."* (Emphasis supplied.)

The board consists of five members appointed by the Governor, by and with the advice and consent of the State Senate. The term of office is for five years with one term expiring each year, thus insuring continuity of personnel on the board. Sec. 47–403 as amended by Ch. 5, S.L.1951. (This latter amendment was repealed by Ch. 13, S. L.1951, now held in abeyance by referendum proceedings.)

Section 47–404 relates to the powers and duties of the board. Among other things, the board is required to make frequent inspections of the institutions, supervise the instruction given in the schools connected with the institutions, appoint a superintendent, and prescribe rules and regulations for the government of the institutions.

Section 47–406 provides for the appointment of a superintendent by the board who must be qualified in business administration, education and *public welfare*.

Section 47–407 relates to the duties of the superintendent. This section, among other things, provides that

" * * * (he) shall: (a) Reside at the institution. (b) Have charge of the institution and its management, subject to the direction of the board. * * (e) Make a report to the board at the end of each fiscal year, * * * and an account of rehabilitation work done, methods employed, and results obtained; * * * (f) Direct subordinate officers and employees in their duties and supervise their work. (g) Provide for the care of residents of the institution, protection of their health, their instruction in academic subjects and useful trades and occupations, development of their characters, and inculca-

tion of principles of morality, sobriety and industry."

Section 47–408. All teachers, medical officers and other employees are appointed by the board.

These statutory provisions show that the legislature has given serious consideration to the matter of providing for the detention, support, health, education and rehabilitation of juvenile offenders. Public records disclose that the average daily attendance at the industrial school is 70, and that for the past several years there has been made available for the operation of the institution approximately $150,000 per year.

It is the theory of the respondents that by virtue of the law conferring upon superior courts the exclusive jurisdiction in all matters and proceedings affecting delinquent children, and that no commitment shall divest the court of its jurisdiction for the purpose of enforcing its judgments and orders, that the board and superintendent of the industrial school are officers of the court and that the superintendent acts as bailee or custodian of the court.

Respondents also contend that a commitment of the juvenile court brings into operation all the statutory provisions relating to juveniles (to be executed by the board and its superintendent), and by necessary implication constitutes such provisions an integral part of the order of commitment. With this contention we do not agree. By stressing the power of "continuing jurisdiction" with the idea that the superintendent is the custodian of the court results in the conclusion that the superintendent of the school has fourteen (number of juvenile courts) masters to satisfy under the threat of punishment by way of contempt should the methods employed by him in providing for the health, instruction, development of character, and inculcation of principles of morality, sobriety and industry not meet with the ideas of the committing judge. "No man can serve two masters." Matt. VI, 24.

Under our fundamental law providing for a separation of powers, the Constitution provides (Art. 3):

"The powers of the government of the state of Arizona shall be divided into three separate departments, the Legislative, the Executive, and the Judicial; and, except as provided in this constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others."

It requires no analysis or dissertation to establish that the industrial school is a branch of the executive department of government and controlled by executive officers. By the express provisions of Section 47–402,

"The government of state institutions for juvenile offenders and the administration of laws for the detention, education and treatment of juvenile offenders is vested in the board."

Under the constitutional provisions of Art. 6, Sec. 6,

"* * * The powers of said judges to control such children shall be as prescribed by law. * * *"

The only power that has been prescribed by law and conferred upon judges, insofar as we are here concerned, is the power to commit. While it is true that no commitment shall divest the court of jurisdiction for the purpose of enforcing its judgments and orders, in the instant case it has made no orders other than that the boys should be received and detained until released as provided by law. In view of the fact that the government of the institution provided for juvenile offenders "* * * and the administration of (the) laws for the detention, education and treatment of juvenile offenders is vested in the board," we cannot conceive of any order that the court could initially make other than the order of commitment to receive and keep. The board and its superintendent are state officers of the executive branch of the government and their allegiance as such officers is not to the court but to the law, the penalty for nonperformance of their duties being removal from office or fine and imprisonment.

We have several criminal statutes in the 1939 Code for the protection of children which subject any person to criminal prosecution who commits any offense against children. By the provisions of Section 43–1001, any person who contributes to the delinquency of a child or who for any cause shall be responsible therefor is guilty of a misdemeanor and subject to fine and imprisonment. Any adult person who assaults a child is guilty of a felony. Section 43–603. And by the provisions of Section 43–3909

"* * * Every officer who is guilty of wilful inhumanity or oppression toward any prisoner under his care or in his custody, or who, under color of authority, without lawful necessity, assaults or beats any person, is punishable by fine not exceeding one thousand dollars ($1,000) * * *".

Violation of these statutes infringing upon the civil rights of these wards should be called to the attention of the county attorney of the county where the offense is committed. If he refuses to take appropriate action, the Attorney General, by the direction of the Governor, might initiate prosecutions, Westover v. State, 66 Ariz. 145, 185 P.2d 315, or appeal may be made to the judge of the superior court who could impanel a grand jury that has the power of indictment to make inquiry.

This court, in Howard v. State, supra, held that the sentencing court (superior court) had jurisdiction to proceed in contempt proceeding upon a petition for a rule to show cause which showed that the petitioner, a prisoner, was being subjected to cruel and unusual punishment by the warden of the state penitentiary. The court observed [28 Ariz. 433, 237 P. 204]:

"Considering the whole history of penal legislation of the last 100 years in the United States, and particularly of the last generation in Arizona, we feel justified in stating that our state at present adheres to the general policy, that while for the protection of society it is necessary to deprive the offender against its laws of his liberty for a greater or lesser period, yet such deprivation should be conducted as humanely as possible, and with the view of eventually, if that happy result is possible of · realization, restoring him as a useful citizen to society.

"When, therefore, the superintendent of the prison receives the commitment, which is his only authority for detaining any man within that prison, he may only do what that commitment orders him, to wit, 'receive and safely keep' the defendant for the time specified therein. If, without legal justification, he does more than is necessary to so safely keep him, he is violating the law just as much as he is in releasing him before the expiration of his minimum term of sentence unless he has been legally pardoned. On the other hand, he not only may but must do what is necessary to 'safely keep' the prisoner. * * *

"But, in any case, he is still under both the power and protection of that law which should be as vigilant to guard his rights as to punish his transgressions. Nor should the fact that he has once fallen under its ban deafen the ear of justice. If he complains that the rights still left him are being violated, the law should be particularly zealous to investigate an alleged wrong against one whom it has deprived, even though justly, of the precious boon of liberty. We hold, therefore, that any prisoner who, while under sentence for crime, is subjected to unreasonable and harsh treatment without legal justification therefor, may appeal to the law for protection * * *."

The court then concluded that the alleged treatment was prima facie harsh and unreasonable and demanded inquiry and correction. The court then said:

"* * * The situation thus stated *obviously suggests the proper remedy.* When a court of record in a civil action orders a party to do or not to do a certain thing, and its order is disobeyed the remedy is the *invocation of that inherent power existing in all such courts to punish a violation of its order as a contempt.* * * *

"The superintendent of the state prison is ex officio an officer of each superior court of the state for the purpose of carrying out its proper sentences, and is subject to attachment for contempt if he departs therefrom, either on the side of excessive leniency or severity, without legal excuse therefor." (Emphasis supplied.)

The situation there presented was shocking in a country and state where vengeance and brutality have been practically extinguished through Christian teachings. But our considered opinion at this time is that the court was so anxious to remedy a wrong that it persuaded itself to grasp at the inherent powers of the court to protect itself and enforce its orders by the summary and plenary proceedings of contempt. It had to look to its "order", the order to detain or "safely keep" and then reasoned that excessive and cruel treatment exceeded the order and was a *violation* of the order. This required recourse to the suggestive significance of the words of the order apart from their explicit and recognized meaning; so the court held that the words "safely keep" have the connotation of keep with such force only as is required for restraint, and if more is done there is a violation of the law. In this view we concur, but the violation of the *law* is not redressible by contempt. People ex rel. Grenfell v. District Court, 1931, 89 Colo. 78, 299 P. 1. Our philosophy and legal approach to the concept of governmental theory under which we live suggests to us that the judiciary should closely scrutinize its assigned field or sphere and rotate in its own orbit. The courts are not the masters nor are they vested with totalitarian powers to correct all evils and aggressions on the rights of our citizens. That they are solicitous of the welfare of our people is to be expected and commended, but under our scheme of government there are other branches manned by officers of like attitudes and sensibilities to whom is assigned the duty of governing such institutions as the one under review. In so doing they have prescribed powers and duties all of which have been enacted and promulgated by the people, speaking through the legislative branch of the government.

A review of the statutory provisions, supra, relating to juveniles, demonstrates the benevolence of their provisions. These laws are to be executed by the executive branch of the government and not by the judiciary. These observations and opinions lead us to believe that the holding of this court in Howard v. State was erroneous and usurped to the courts powers not intended or conferred. Insofar as the decision and the rule therein laid down in Howard v. State impliedly holds that the superintendent of the industrial school may be proceeded against as for a contempt for allegedly inflicting upon one in their custody cruel and unusual punishment, it is overruled. In so holding, we do not intend to deviate from the rule laid down in Re Wright, 36 Ariz. 8, 281 P. 944, and State ex rel. Murphy (Sims) v. Superior Court, 30 Ariz. 332, 246 P. 1033, 47 A.L.R. 401, wherein it was determined that the warden could be proceeded against by contempt proceedings for permitting a prisoner to roam at large or be released prior to the expiration of his sentence. The rule of these cases holds a warden or superintendent of the industrial school to the explicit

words of the mandate of the commitment but not to its connotations. Connotations or implications from orders are of many hues and distinctions. In no event are they of the stature of *orders* that no one can or should misinterpret and for whose violation the stern remedy of contempt will reach.

We hold that petitioner, as Superintendent of the Industrial School for Boys, is not subject to attachment for contempt for allegedly subjecting wards of the state in his custody to such severe punishment that it is properly designated as cruel and unusual. We do not want it understood that this court condones in the slightest the more serious specifications set forth in the several rules to show cause. If the assaults charged were in fact committed their perpetrators should be prosecuted, but the short-cut route selected was without authority of law. The named courts being without jurisdiction in the premises, it follows that the motion to quash the alternative writ must be denied and it is so ordered.

It is further ordered that the alternative writ be made permanent.

UDALL, C. J., and STANFORD and DE CONCINI, JJ., concurring.

PHELPS, Justice (dissenting).

I respectfully dissent from the conclusion reached by the majority in this cause.

In the first place article 6, section 6 of the Arizona Constitution insofar as the same is here material, provides that:

"The superior court shall have exclusive original jurisdiction in all proceedings and matters affecting dependent, neglected, incorrigible, or delinquent children, or children accused of crime, under the age of eighteen years. The judges of said courts must hold examinations in chambers of all such children concerning whom proceedings are brought, in advance of any criminal prosecution of such children, and shall have the power, in their discretion, to suspend criminal prosecution for any offenses that may have been committed by such children. The powers of said judges to control such children shall be as prescribed by law."

It will be observed that the exclusive jurisdiction granted to the superior court embraces "all proceedings *and matters* affecting * * * delinquent children * * *." (Emphasis supplied.) The framers of the constitution in using the language above quoted, 'in all proceedings *and matters* affecting * * * delinquent children" intended not only to vest the superior court with authority to conduct hearings and pronounce judgments of commitments in juvenile cases but it granted to the court jurisdiction *in all matters affecting delinquent children* which is broad enough in its terms to embrace every matter affecting the life of such juvenile during its minority. This court has no authority to ignore the words "and matters affecting * * * delinquent children". It was intended to have

a meaning different from court proceedings, otherwise it would not have been used.

It will be further observed that the constitution in the succeeding sentence provides that the judges of said courts (not the courts) must hold examinations in chambers of all such children concerning whom proceedings are brought in advance of any criminal prosecution and that the judges are given the power and discretion to suspend criminal prosecution. It then proceeds to provide that "The powers of said judges (not the courts) to control such children shall be as prescribed by law." This latter provision constitutes in my opinion an implied mandate to the legislature to pass legislation giving to the judges of the juvenile courts the power to control such children during the period of their minority or until such time as their conduct may be restored to a normal pattern consistent with moral rectitude and right living.

When considering this section of the constitution relating to the jurisdiction of the superior court affecting dependent, neglected, incorrigible or delinquent children, it is my view that the legislature does not have the power to divest the superior court handling juvenile delinquents of its jurisdiction over *all matters affecting such children,* any more than it has the power to divest it of its jurisdiction *over all proceedings affecting such children.* Article 6, section 9 of the constitution providing for courts of justices of the peace, provides that said justices shall have such powers, duties and jurisdictions as shall be provided by law. The mandate to provide that jurisdiction and those powers is no more explicit than it is in article 6, section 6, providing that the powers of the judge (not the court) to control children shall be prescribed by law. It certainly cannot be argued that article 6, section 9, did not constitute a mandate to the legislature to prescribe the powers, duties and jurisdictions of justices of the peace. In any event it is clearly manifest from the language used in article 6, section 6 of the constitution, supra, that the framers intended that the legislature should provide for the judges of the superior courts exercising juvenile jurisdiction to have control over dependent, neglected, incorrigible and delinquent children, etc., during their minority. This is further evidenced from the fact that the framers of the constitution, in the same section thereof, recognized a distinction between the court and the judge, wherein it provided that:

"Superior courts and their judges shall have the power to issue writs of mandamus, quo warranto, (etc.) * * *."

In other words a judge wherever he may be found within the jurisdiction of the court may, under the above authority, issue a writ of this character which under the terms of the constitution has the same force and effect as if issued by the court. This

court has, in at least two cases, discussed the difference between the court and a judge of the court and their respective powers. Andrade v. Andrade, 14 Ariz. 379 at page 384, 128 P. 813; and in Deatsch v. Fairfield, 27 Ariz. 387 at page 394, 233 P. 887, 890, 38 A.L.R. 651. The court there said:

"* * * There is a difference between the court and the judge of the court. It takes more than the presiding officer to constitute the court. As is said in Chow Loy v. U. S., 112 F. 354, 50 C.C.A. 279: 'A court is not a judge, nor a judge a court.' When we speak of a court we think of the presiding judge, a clerk, parties, and attorneys, and while all of these are not necessary to constitute the court neither is the judge alone the court. (Citing cases.) * * *"

Therefore when the framers of the constitution impliedly directed the legislature to give to the judge the control over juvenile delinquents necessary to carry out the purposes of the constitution they were intending that he should exercise that control rather than the court.

By directing the judges to hold examinations in chambers of children concerning whom proceedings are brought, in advance of any criminal prosecution, the framers again indicated that such proceedings should be by the judge and not by the court.

The legislature failed to enact legislation in accordance with the provisions of article 6, section 6, but it did enact laws providing that where proceedings were instituted concerning a delinquent pending final disposition the child should be subject to the order of the court and that it may be permitted to remain in the home of its parents, guardian or person having its custody or of the probation officers or it may be detained in a place provided by state or county authorities or by any association or agency, public or private, for the care of delinquent, neglected or dependent children. This gives to the court the authority to exercise control over the juvenile. Section 46–125, A.C.A.1939, provides for hearings, disposition, and continued control over all such delinquents not committed to the industrial school.

Section 46–132, A.C.A.1939, provides that:

"(a) When jurisdiction has been obtained by the juvenile court in the case of any child, the child shall continue under the jurisdiction of the court until he becomes twenty-one (21) years of age, unless sooner discharged. No commitment shall divest the court of jurisdiction for the purpose of enforcing its judgments and orders. No commitment of any child shall extend beyond the minority of the child, and commitments to the state industrial school or a school or institution for girl juveline offenders shall be for the term

of the child's minority, unless sooner discharged.

"(b) The court, in making orders for the commitment or adoption of a child, shall place it, as far as possible, in the custody of persons having the same religious belief; and shall provide, as far as possible, that the care and discipline of the child shall be as nearly as possible that which should be given by its parents. Whenever possible the child shall be placed in an appropriate family home and become a member of the family by adoption or otherwise."

Section 46–133 thereof provides that no delinquent child under the age of twelve years shall be committed to the state industrial school, nor to any school or institution for girl juvenile offenders unless after the care given it by probation, the court finds that the interests of the child and the welfare of the community demand its commitment, nor shall any neglected or dependent child be committed to any such school

Under section 46–132, supra, the legislature expressly provided that the court should not be divested of its jurisdiction over the juvenile by reason of its commitment to the industrial school so as to deprive it of its power to enforce its judgments and orders relating to such delinquent juvenile.

It is stated in substance in the majority opinion that the judgment of commitment means nothing whatever except that the child shall be committed to the institution. The inference is that the court should have incorporated in the judgment all those provisions necessary to its protection and safekeeping. Not having done so there is nothing upon which the court can justify its action in this case.

According to the provisions of section 47–410, A.C.A.1939, the very purpose of maintaining this institution for juvenile offenders is for the detention, education, employment, and reformation of male juvenile offenders committed in accordance with the provisions of article 1, chapter 40, Revised Code of 1928; and subsection (g) of section 47–407, A.C.A.1939, provides:

"The superintendent of each institution shall:

\*   \*   \*   \*   \*   \*

"(g) Provide for the care of residents of the institution, protection of their health, their instruction in academic subjects and useful trades and occupations, development of their characters, and inculcation of principles of morality, sobriety, and industry."

These provisions become as much a part of the judgment of commitment as if written into the judgment itself. It is therefore the duty of the superintendent to see that the health of the residents of the institution is protected, that they receive instructions in academic subjects and useful trades, that their character shall be developed and that he shall inculcate into their minds and hearts principles of moral-

ity, sobriety and industry; reformation being the primary objective.

There is no authority granted under the provisions of this act for any of the treatment alleged to have been administered to the boys involved in this matter. Certainly there is no authority either express or implied for assault of any kind or character upon such boys and I am satisfied that no reputable child psychologist would recommend such treatment as being conducive to the rehabilitation or reformation of the type of boy committed to that institution.

The majority opinion states that under the provisions of section 47–402, supra, the government for state institutions of juvenile offenders is vested in the Board, and that this divests the court or the judge of any further authority over boys committed therein. Let us see what the statute says with respect to the powers of the board. Section 47–404, A.C.A.1939, states that the board shall:

"(a) Prescribe systems of records and accounts, subject to the approval of the state auditor.

"(b) Make frequent inspections of the institutions.

"(c) Supervise the instruction given in schools connected with the institutions, and order any changes in method which will improve the instruction given.

"(d) Appoint a superintendent for each of the institutions.

"(e) Cause its annual report to be printed for the information of the public, and a copy thereof to be mailed to each member or member-elect of the legislature.

"(f) Prescribe rules and regulations for the government of institutions.
All of these provisions except subsections (c) and (f) and perhaps (b) relate to the financial and business aspects of the institution. The duties of the superintendent as prescribed by section 47–407, supra, are that he shall:

"(a) Reside at the institution.

"(b) Have charge of the institution and its management, subject to the direction of the board.

"(c) Purchase supplies for the institution, under orders of the board.

"(d) File with the board not later than the fifth day of each month a detailed report of expenditures, with an account of the condition and activities of the institution during the preceding month, and such other reports as the board may require.

"(e) Make a report to the board at the end of each fiscal year, which shall include a comprehensive statement of the condition of the institution; a detailed financial statement including each individual transaction, total cost of maintenance, per capita cost per year and per month, per capita cost per month of the keep of residents, and

such other items as will clearly reflect the financial status of the institution; and an account of rehabilitation work done, methods employed, and results obtained; recommendations for improvement of the institution; and such other information as the board may require.

"(f) Direct subordinate officers and employees in their duties and supervise their work."

(g) As above quoted alone relates to the duties toward the inmates.

The board and the superintendent have only such powers as are expressly or by necessary implication granted to them by the legislature. The position of the majority opinion with respect to the government of the institution being vested in the executive branch of the state government would be sound except for the fact that the constitution vested power and jurisdiction in the juvenile court over juvenile delinquents *in all matters affecting them* and may I here pose the question, what could more vitally affect a child who for some cause happens to be a social misfit, than proper environment and proper treatment? The constitution further impliedly directed the legislature to enact laws giving to the judge power to control said juveniles during their minority and it did not limit that control to delinquents who were not committed to the industrial school.

The statute gives to the juvenile court the authority to supervise delinquent children not committed to the industrial school and expressly places supervision of the detention home in the juvenile court. It is a singular situation indeed if the law, under the provisions of section 46–125, supra, which clearly gives the juvenile court authority to place a delinquent child with such person, in such environment and under such supervision as the judge may deem to be for the good of the child and interest of the state, denies to the court or the judge thereof the authority to exercise such supervision over a child committed to the industrial school as the court or judge deems to be for the good of the child or the interest of the state. It is this type of boy who is committed to the industrial school who needs such supervision more than any other type coming before the court.

It is my view that section 46–132, supra, vested the court with authority to protect boys committed to the institution from mistreatment or brutality of any character in the enforcement of its judgments and orders. Under a judgment of commitment it is just as much the duty of the superintendent of the industrial school to protect such a resident from improper or brutal treatment as it is to protect his health or as it is to safely keep him within the institution. Webster defines "safe" to mean, "free from danger of any kind, as safe from enemies; safe from disease." Louisville & N. R. Co. v. Brownlee, 14 Bush 590, 595, 77 Ky. 590, 595. And under the provisions of section 46–129, A.C.A.1939, which provides

that any persons who wilfully violates or neglects or refuses to obey or perform any order of the juvenile court may be proceeded against for contempt provides ample authority for the respondents' *citation for* contempt and upon sufficient proof of violation of such judgments or orders the court has authority and power to punish as for civil contempt.

This is a civil action, not criminal, and as I see it the case of Howard v. State, 28 Ariz. 433, 237 P. 203, which had to do with the enforcement of a judgment in a criminal case, has no application here and it is therefore unnecessary to overrule that decision in this case.

In dissenting from the majority opinion I am concerned only with the power and jurisdiction of the superior court exercising juvenile jurisdiction as determined by what I consider to be a reasonable interpretation of the constitution and the acts of the legislature relating thereto. Whether the officials or employees of the industrial school have overstepped the rules of propriety or committed any wrong whatsoever, I have no knowledge. That question is not before us. It rests exclusively with the superior court.

I am thoroughly convinced that the respondents acted within their constitutional and statutory authority in issuing the rule to show cause against petitioner and that the writ of prohibition should be quashed.